894 So.2d 438 (2005)
Jerry G. RATHEY, Husband of/and Mable Rathey
v.
PRIORITY EMS, INC., Richard Scott Samuel, Joan Savoy, St. Bernard Parish Sheriff's Office, through its Sheriff, Jack Stephens, David Pierce, C.J. Acosta and ABC Insurance Company.
No. 2004-CA-0199.
Court of Appeal of Louisiana, Fourth Circuit.
January 12, 2005.
Rehearing Denied February 24, 2005.
*444 Gary B. Roth, Orrill, Cordell & Beary, L.L.C., Todd R. Slack, Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C., New Orleans, LA, for Plaintiffs/Appellees.
James Ryan, III, Timothy T. Roniger, James Ryan, III & Associates, LLC, New Orleans, LA, for Defendant/Appellant (Priority EMS, Inc.).
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, Judge JAMES F. McKAY, III, Judge TERRI F. LOVE, and Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS, JR., Judge.
This is a personal injury action. The plaintiffs, Jerry Rathey and his wife, Mabel Rathey, allege that they sustained personal injuries as a result of the negligent or grossly negligent use of hard restraints (i.e., handcuffs and shackles) by emergency medical technicians ("EMTs") to subdue Mr. Rathey while he was having a medical emergency (i.e., a seizure) on 31 March 1995 at a McDonald's. The EMTs, Richard Scott Samuel and Joan Savoy, and their employer, Priority EMS, Inc., appeal the trial court's decision in favor of Mr. Rathey. The Ratheys answer the appeal. For the reasons that follow, we affirm the trial court's finding of fault on the part of Priority and its EMTs, reallocate the fault, and reverse in part the damage awards.
On 29 March 1996, the Ratheys commenced this personal injury action against two groups of defendants; to-wit: (i) the EMTs, Mr. Samuel and Ms. Savoy, and their employer, Priority (collectively "Priority"); and (ii) the law enforcement officers, Deputies Tony Perzichilli and Gerald Acosta, and their employer, the St. Bernard Parish Sheriff's Office through Sheriff Jack Stevens (collectively the "Sheriff's Office"). Mr. Rathey claims that he was injured by the actions taken by the EMTs and the deputies to restrain him using hard restraints (i.e., handcuffs and shackles) while he was having a seizure. He alleges his injuries included "nerve damage to his wrist, neck, ankle and other parts of his body." Mr. Rathey further alleges that as a result of these injuries he has been unable to return to his job at Memorial Gardens Cemetery as a caretaker and a gravedigger and that he is permanently unable to work. Mrs. Rathey also asserts a loss of consortium claim.
As to Priority, the Ratheys allege it was negligent in the following respects: (i) failing to properly train its paramedics in assessing, diagnosing and providing a proper plan of treatment and course of action for individuals experiencing seizures; (ii) failing to properly handle a victim experiencing a seizure; (iii) failing to properly address the needs of an individual experiencing grand mal seizures; and (iv) attempting to restrain an individual while experiencing seizures when they knew or should have known of the proper method of handling someone experiencing seizures.
In December 2002, a four-day bifurcated trial was held in this matter. The trial court tried the claims against the governmental *445 defendants, the Sheriff's Office and its deputies, and the jury tried the claims against the non-governmental defendants, Priority and its EMTs. The trial court analyzed the claims against the Sheriff's Office defendants under La. R.S. 37:1732, which provides a qualified immunity for a deputy who provides emergency care, first aid, or moves a person receiving such care to a hospital except for acts or omissions intentionally designed to harm or grossly negligent acts or omission.[1] Finding this immunity applied to Deputy Acosta in his restraining of Mr. Rathey and finding he was not grossly negligent, the trial court exonerated the Sheriff's Office defendants, reasoning:
Based on the evidence it is obvious that time was of the essence in dealing with Mr. Rathey. Depending on which testimony one accepts he was either turning blue or he was pale or ashen. He had struck his head on doors and on the floor. The independent witness Michael Lassange [sic] indicated he had never seen any thing [sic] like it before. Paramedic Samuel asked for the police to cuff [Mr.] Rathey. It was his decision to cuff Mr. Rathey. He asked for plastic ties to be used, but was told that this was not available. The police officers were reasonable in using the readily available resources  handcuffs.
On the other hand, the jury tried the claims against Priority. At Priority's request, and over the Ratheys' objection, the trial court charged the jury that the applicable standard of care as to Priority was gross negligence based on the qualified immunity for EMTs provided in La. R.S. 40:1233 A(1).[2] Yet, at the Ratheys' request, and over Priority's objection, the trial court submitted a negligence interrogatory to the jury (i.e., interrogatory number three quoted below), requiring the jury to determine whether Priority's EMTs actually were following its protocols and thus entitled to immunity from liability *446 for ordinary negligence.[3]
The jury answered the special interrogatories as follows:
1. Were the acts or omissions of the Priority EMS personnel Richard Scott Samuel and/or Joan Savoy grossly negligent acts or omissions which resulted in harm to the plaintiff, Jerry G. Rathey?
[Answer: YES]
2. Were the acts of the Priority EMS personnel Richard Scott Samuel and/or Joan Savoy a cause of the injuries sustained by Jerry G. Rathey?
[Answer: YES]
3. Do you find Priority EMS personnel negligently failed to follow the Priority EMS protocol?
[Answer: YES]
4. Were the acts of the St. Bernard Parish deputies in restraining the plaintiff, Jerry G. Rathey, grossly negligent under the circumstances?
[Answer: NO]
5. Were the actions of the St. Bernard Parish Sheriff's Office personnel a cause of the injuries sustained by the plaintiff, Jerry G. Rathey?
[Answer: YES]
6. Were the actions of the plaintiff, Jerry G. Rathey, sufficient to constitute negligence on his part?
[Answer: YES]
7. Were the actions of the plaintiff, Jerry G. Rathey, a cause for his own injuries?
[Answer: YES]
The jury allocated fault among the parties as follows: 60% to Priority, 30% to Mr. Rathey, and 10% to the Sheriff's Office. The jury then itemized the damages as follows:

 Physical pain and suffering $ 500,000
 Past, Present and Future
 Mental Anguish 100,000
 Past, Present and Future
 Loss of Enjoyment of Life 10,000
 Loss of Past Wages 100,000
 Loss of Future Earnings 65,000
 Or Earnings Capacity
 Past Medical Expenses 15,427
 Future Medical Expenses 12,000
 _______
 Total $802,427

The jury found that Mrs. Rathey was not entitled to any loss of consortium damages.
The trial court entered two separate judgments. The first judgment dismissed the claims against the Sheriff's Office defendants. The second judgment was rendered in accordance with the jury's findings in favor of Mr. Rathey and against Priority for 60% of the damages. That judgment also ordered that the parties share the costs of the proceeding proportionately with 60% of the costs being assessed against Priority in accordance with the jury's apportionment of fault. In that judgment, the trial court expressly reserved the Ratheys' right to raise the *447 issue of reallocation of the 10% fault the jury allocated to the Sheriff's Office and the assessment of a proportionate percentage of costs to them. The Ratheys raised those issues in their motion for new trial, which the trial court denied. The trial court also denied Priority's JNOV motion and motion for new trial. From those decisions, Priority appeals, and the Ratheys answer the appeal.
On appeal, Priority asserts three assignments of error. First, it asserts that the trial court committed legal error by submitting the negligence interrogatory to the jury because La. R.S. 40:1233 A(1) applies, making this solely a gross negligence case; thus, a de novo standard of review applies. Second, it asserts that the jury's findings that it was negligent and grossly negligent in attending to Mr. Rathey are manifestly erroneous because those findings lack a reasonable factual basis. Third, it asserts that the jury abused its discretion in assessing a total of $610,000 in general damages and $165,000 in loss wages.
Answering Priority's appeal, the Ratheys assert three assignments of error: first, they assert that the trial court erred in permitting the jury to allocate fault to Mr. Rathey; second, they assert that the trial court erred in refusing to reallocate the fault the jury allocated to the St. Bernard Parish Sheriff's Office to the remaining parties under the ratio approach enunciated in Gauthier v. O'Brien, 618 So.2d 825 (La.1993); and third, they assert that the jury erred in failing to award Mrs. Rathey any loss of consortium damages. They also contend that the trial court erred in assessing any costs to them.
On 31 March 1995, Mr. Rathey, who was fifty-three years old, experienced the effects of a seizure while having lunch with his wife at the McDonald's located at 8621 West Judge Perez Drive in Chalmette, which is in St. Bernard Parish (the "McDonald's"). Mr. Rathey had an extended history of epilepsy dating back to his childhood. Since childhood, he has been on anti-seizure medication (i.e., Dilantin and Phenobarbital). Mr. Rathey testified that he tried to take his medication daily, but he acknowledged that "once in a great while" he might miss taking it. He also testified that his seizures did not affect his ability to work.
In 1988, Mr. Rathey and his wife met at the cemetery where he was working as a gravedigger and caretaker when she came to visit her recently deceased husband's grave. In 1989, they were married. During the seven-year period between when Mr. and Mrs. Rathey met and the McDonald's incident (i.e., from 1988 to 1995), Mr. Rathey had only one seizure, which occurred in 1994. The 1994 seizure occurred while he was hospitalized at Chalmette Medical Center ("CMC") following a one-car accident. The CMC records reflect that following that seizure he had to be given Valium and restrained in the hospital bed using four point restraints. On that occasion, Mr. Rathey's Dilantin level was sub-therapeutic. In his deposition, Dr. Lee Domangue, the CMC emergency room doctor who treated Mr. Rathey in both 1994 and 1995, recalled warning Mr. Rathey during that 1994 hospitalization of the importance of taking his anti-seizure medication.[4] Dr. Domangue also testified that the discharge note from the 1994 hospitalization stated that the neurologist, Dr. Vogt, opined, "the patient's seizure disorder *448 was brought on by his sub-therapeutic level of Dilantin."
When Mr. Rathey was treated on 31 March 1995, following the seizure at McDonald's, Mr. Rathey's Dilantin level again was sub-therapeutic. Dr. Domangue explained that the normal therapeutic range for Dilantin is between ten and twenty; Mr. Rathey's Dilantin level that day was four. In his report from Mr. Rathey's initial visit dated 19 April 1995, Mr. Rathey's treating neurologist, Dr. John Olson, noted that "[u]nfortunately the patient's Dilantin level was approximately four at the time he was brought to De La Ronde Hospital explaining the recurrence of his seizure episode."[5]
On Fridays, the Ratheys routinely spent Mr. Rathey's half-hour lunch break together at McDonald's. According to Mr. Rathey, their routine was Mrs. Rathey would pick him up at the cemetery at his lunch break, they would eat lunch together at McDonald's, she would bring him back to work, and then she would go home. They routinely sat in the back of McDonald's near the restrooms. They routinely ordered an "All American Meal" with cheese substituted instead of meat because they did not eat meat on Friday. As a result of their routine, the Ratheys became well liked and well known by name at McDonald's. Indeed, a long-term McDonald's employee, Larry Lasseigne, described them as their most popular customers.
On 31 March 1995, the Ratheys were following their Friday routine. Mrs. Rathey picked her husband up from the cemetery at around noon, and they went to McDonald's. They ordered their usual cheese sandwiches, which Mr. Lasseigne prepared for them. They sat in their usual spot in the back near the bathroom. When they were finished eating, Mrs. Rathey excused herself from the table to go to the bathroom before leaving to bring Mr. Rathey back to work. But, when she returned to the table, she found Mr. Rathey looked funny; his eyes were glassy, and his mouth was foaming. Realizing that he was having a seizure, she cried out for help from Debbie Stanton, the McDonald's assistant manager, or Mr. Lasseigne. She requested that they bring her a rag or something to wipe her husband's face.
Mr. Lasseigne testified that about five minutes after he served the Ratheys their cheese sandwiches, a well-dressed gentleman approached the counter and requested a manager. The gentleman then asked if there was someone named Mike that worked there. Mr. Lasseigne responded that he was named Mike, and the gentleman directed him to the side area of the restaurant that leads towards the restrooms. There he found Mrs. Rathey crying, and Mr. Rathey on the floor with foam coming out of his mouth. Mrs. Rathey told him that her husband was having a seizure. Mrs. Rathey also told him that her husband's seizures usually last a few minutes and that he should come around soon. However, minutes passed without Mr. Rathey coming out of the seizure.
During those minutes, according to Mr. Lasseigne, Mr. Rathey was making loud noises and getting up and running around McDonald's. He was running into chairs, running into tables, and running in and out of the ladies' bathroom three times. Mr. Rathey also ran into a glass door three times, head-butting it. Indeed, Mr. Lasseigne emphasized that Mr. Rathey butted the door so hard on one occasion that the *449 glass rattled, and he thought the glass was going to break. He described this as similar to a "WWF move" or like something you see in wrestling. Although Mrs. Rathey acknowledged that Mr. Rathey had butted the door with his head, she testified that he did so only once, that he did so lightly, and that, as a result of doing so, he developed a little red mark on his forehead.
Both Mr. Lasseigne and Mrs. Rathey testified that Mr. Rathey tried to exit the glass door and that they were concerned he would injure himself by running in front of a car. Immediately outside that door is where the McDonald's drive-through window line is located. Because it was lunchtime, there was bumper-to-bumper traffic in that line. Given this safety concern, Ms. Stanton, at Mrs. Rathey's request, locked that door. Mrs. Rathey, nonetheless, denied that her husband was a danger to himself or anybody else.
Mr. Lasseigne and the gentleman who had summoned him suggested that they call 911, but Mrs. Rathey opposed this suggestion. She testified that she did not want to call 911 for two reasons: first, she could not afford to pay for it; and second, she claimed Mr. Lasseigne had told her that she could take her husband home soon. After explaining to Mrs. Rathey that company policy mandated that when there was a medical emergency 911 be called, Ms. Stanton did so. At Mrs. Rathey's request, Ms. Stanton also called Mrs. Rathey's son, David Laurente, and daughter-in-law and informed them that Mr. Rathey was having a medical emergency at McDonald's.
According to the Priority run report, the 911 call was placed at 1:28 p.m.[6] In response, the Sheriff's Office dispatched a Priority unit to McDonald's. Priority, at that time, had the contract with the Sheriff's Office to provide 911 services in St. Bernard Parish.
At 1:32 p.m., four minutes after the 911 call was placed, the Priority unit, staffed by two EMTs, arrived at McDonald's. According to Mr. Lasseigne, the two EMTs did the same thing that he and the McDonald's customer (i.e., the bystanders) had been doing; they tried to reason with Mr. Rathey and to hold him down.
As noted, the two EMTs were Mr. Samuel, an EMT-paramedic, and Ms. Savoy, an EMT-intermediate.[7] Ms. Savoy drove the ambulance; Mr. Samuel was the senior EMT and thus the team leader. As team leader, Mr. Samuel prepared the ambulance run report; made the decisions, such as what protocol to follow; and entered McDonald's first to assess the situation.
Mr. Samuel testified that when he entered McDonald's, he found Mr. Rathey laying on the ground and being attended to by bystanders (i.e., Mr. Lasseigne and a McDonald's customer). The bystanders initially helped them hold Mr. Rathey down, but later stepped back to let them assess the situation. Mr. Samuel asked the bystanders what was going on and was told that Mr. Rathey had been experiencing a seizure and that he had been "beating *450 his head up against the wall and that they were having a hard time controlling him." Mr. Samuel testified that he also had a conversation with Mrs. Rathey, who was sitting at a nearby table, regarding Mr. Rathey's medical problems, the medications he was taking, and whether he had any drug allergies. Based on his assessment, Mr. Samuel testified that he believed Mr. Rathey was having a seizure, albeit not a typical one. Mr. Samuel explained that he attempted to reason with Mr. Rathey and to restrain him, but he quickly realized that Mr. Rathey was too combative for them to control. As a result, he instructed Ms. Savoy to call for law enforcement assistance.
Similarly, Ms. Savoy testified that when they arrived, they found a very combative patient; indeed, she stated that she had never seen someone as combative as Mr. Rathey was that day. She testified that Mr. Samuel first tried to restrain Mr. Rathey, but he unable to do so because Mr. Rathey was swinging and lashing at him. She explained that "he was thrashing his arms and legs, swinging, kicking, really like fighting  fighting behavior" and hollering. As a result, Mr. Samuel immediately requested she call for backup because their safety was in jeopardy and because he did not want any of the bystanders to be hurt. When questioned whether she helped Mr. Samuel restrain Mr. Rathey, Ms. Savoy replied that the first thing she did was to call for backup, as she was instructed to do, and then she attempted to help Mr. Samuel restrain Mr. Rathey. Explaining her actions, she testified that "[w]hen you have a man who's over two hundred pounds [Mr. Samuel] and he cannot control him  I was only 140 pounds and cannot  why would I put myself through that a longer length of time."[8]
During the short interval between when Ms. Savoy called for assistance and the first deputy's arrival, Ms. Savoy attempted to assist Mr. Samuel on the ground in restraining Mr. Rathey. At this point, Mr. Samuel testified that he and Ms. Savoy attempted to pull Mr. Rathey out from underneath the table where he was lying so that he would not hurt himself. As they were doing so, Mr. Rathey bit Ms. Savoy. According to Ms. Savoy, he leaned his head and bit her on the lower leg below the knee. Ms. Savoy, however, testified that she did not seek medical attention for the bite because it did not break the skin. She also testified that Mr. Rathey did not injure anybody other than her. Although Mrs. Rathey testified that she did not see Mr. Rathey bite Ms. Savoy, Mr. Lasseigne testified that he witnessed it. Moreover, as noted elsewhere, the incident report introduced into evidence documents that Mr. Rathey bit Ms. Savoy.
In the run report Mr. Samuel prepared after they arrived at CMC, he summarized what occurred in a narrative, which he read in his testimony at trial; particularly, he testified:
I wrote, "Patient is a 53-year-old white male complaining of seizure activity, grand mal type, for approximately four to five minutes. Upon our arrival, patient found combative and being restrained by the bystanders. Patient *451 held down until Sheriff's Office arrival, when he was restrained."
"Patient has history of seizures. Medicines. Dilantin and Phenobarbital.... "Patient is normally compliant, but has not taken today. Patient transferred to CMC or Chalmette Medical Center. Further, patient's wife request without change for complication. Emergency room notified prior to our arrival."
In other sections of the report, Mr. Samuel recorded that Mr. Rathey's skin color was cyanotic, which means turning a little pale and blue; his blood pressure could not be taken because he was restrained (at that time by bystanders); and he was combative. By combative, Mr. Samuel testified he meant that Mr. Rathey was uncooperative and would not allow us to do what we needed to do. Mr. Samuel testified that they attempted to implement the medical protocol for someone actively seizing, but were unable to do so because of Mr. Rathey's combative behavior.
Ms. Savoy disagreed with Mr. Samuel's assessment that Mr. Rathey was actively seizing when they arrived at McDonald's. Although she did not believe Mr. Rathey was actively seizing, she testified that as team leader Mr. Samuel would have made the decision on whether to follow the seizure protocol. She explained that the reason she disagreed was because Mr. Rathey did not have the classic jerking, rigid, cataclonic-type of motion associated with seizures. Ms. Savoy also disagreed with Mr. Samuel's characteristic of Mr. Rathey's skin color as cyanotic. She testified that "[h]e could have very well being seizing prior to our arrival, which could have caused the cyanotic," but that she would characterize his skin color as "pale and ashen." Ms. Savoy also characterized Mr. Rathey as awake, yet in an "incoherent type of state." Although she stated that his airways were not in danger, she noted that it appeared that he probably could have benefited from oxygen. However, she explained that because of Mr. Rathey's combative conduct they were unable to provide any treatment to him.
Mr. Samuel testified that he believed Mrs. Rathey was the one who informed him of Mr. Rathey's current medications and his past history of seizures. Mrs. Rathey, however, denied telling the EMTs anything other than that her husband was having a seizure. Indeed, she testified that the paramedics did not ask her what kind of medication her husband was taking. Mrs. Rathey testified that she knew her husband had taken his medication at lunchtime because she had brought it to him. She further testified that, in general, Mr. Rathey was "pretty good" about taking his medications.
Mrs. Rathey testified that when the EMTs arrived her husband was flat on his stomach and the bystanders (i.e., Mr. Lasseigne and a McDonald's customer) were doing a good job of attending to him. She explained that this was one of the reasons she opposed calling 911 as well as the reason she remained seated at a nearby table while her husband was having a seizure. According to Mrs. Rathey, the first thing Mr. Samuel did when he arrived was to put his knee into Mr. Rathey's back and to exclaim that "[t]his man's getting out of hand" and that "[t]here's nothing we can do with him. So we have to call for back ups." Mrs. Rathey noted that she believed this meant the EMTs were calling for additional paramedics. Contrary to Mrs. Rathey's belief, as noted above, the EMTs called for law enforcement assistance.
According to the run report, the EMTs were at McDonald's a total of sixteen minutes. Ms. Savoy acknowledged that neither she nor Mr. Samuel provided any medical care or treatment to Mr. Rathey *452 during that sixteen-minute period. Ms. Savoy also acknowledged that Mr. Rathey was on the ground when they arrived and that he never got off the ground the entire sixteen minutes they were at McDonald's. However, she testified that "[h]e was trying to get up and get away type stuff," but she explained that they kept him from getting up because before they arrived he had tried to run out into the street, and he was confused. For those reasons, she further explained that she and Mr. Samuel, assisted by the bystanders (i.e., Mr. Lasseigne and a McDonald's customer), continued their attempts to hold Mr. Rathey down on the floor until the deputies arrived.
The deputies arrived within about five or six minutes from the time Ms. Savoy called for assistance and about one minute after Mr. Rathey bit Ms. Savoy.[9] Immediately after the deputies arrived, Ms. Savoy returned to the ambulance to grab the stretcher. Mr. Samuel testified that he informed the deputies that Mr. Rathey had a history of seizures, that he had not taken his medication and was combative, and that they needed to transport him to CMC.
Mr. Samuel further testified that he asked Deputy Perzichilli, the first deputy to arrive, if he had any plastic handcuffs, but was informed that none were available. Rather, Deputy Perzichilli informed him that he only had his metal handcuffs. At that point, Mr. Samuel testified that he and the deputy made a joint decision to use the metal handcuffs to restrain Mr. Rathey. Mr. Samuel testified that he made that decision because this "was the only way that we could get him [Mr. Rathey] out of the McDonald's into the hospital where I felt like he needed to be safely, so he wouldn't hurt himself or hurt us." Deputy Perzichilli placed the handcuffs on Mr. Rathey with Mr. Samuel's assistance.
The second deputy, Deputy Acosta, arrived after Mr. Rathey had been handcuffed. Deputy Acosta testified that when he entered McDonald's Mr. Rathey was not lying calmly on the floor. Rather, "[h]e was still kicking and trying to jump around." Continuing, Deputy Acosta explained that Deputy Perzichilli and Mr. Samuel had Mr. Rathey handcuffed and were holding him down on the floor in a corner. They were all kneeling down around Mr. Rathey, and they were "trying to keep him from hurting himself." When questioned as to what caused him to go get his shackles, Deputy Acosta replied that he did so because Mr. Rathey was "kicking and he was hitting the EMTs with his legs and Officer Perzichilli, so I asked him to hold him a minute `til I go get the shackles and leg irons and put them on his leg."[10] Mr. Acosta then applied the shackles while Deputy Perzichilli and Mr. Samuel held Mr. Rathey down.
When Mr. Acosta was putting the shackles on Mr. Rathey, Joseph Murrhee, a casual acquaintance of the Ratheys, passed by on his way from the restroom. Mrs. Rathey and Mr. Murrhee testified that Mr. Murrhee remarked: "That's a shame what he's doing."
Neither Deputy Acosta nor Mr. Samuel recalled Mr. Samuel being hog-tied. However, *453 Deputy Perzichilli's incident report and his handwritten report, which are in evidence,[11] both state that Mr. Rathey was hog-tied, i.e., a second pair of handcuffs was used to attach the handcuffs on Mr. Rathey's wrists to the leg shackles on his ankles.[12] At trial, Deputy Acosta read portions of the handwritten report during his testimony. Because Deputy Perzichilli's handwritten report was provided to the jury and because it provides a detailed chronological overview of what occurred at McDonald's after the deputies arrived, we summarize it here:
 While on duty, he received a Signal 24 (Ambulance Request), and the dispatcher informed him that Priority was requesting a unit to assist with a combative patient at McDonald's.
 When he entered McDonald's, he noticed a large group of people gathered in the back of the restaurant near the restroom area. Mr. Rathey was located in a small hallway, which leads to the restrooms and the food preparation area. His attention was drawn to the floor by screams of a subject (later identified as Mr. Rathey) lying in the prone position on his stomach and thrashing violently. He also observed blood on the floor, as well as on Mr. Rathey's face, which was coming from an undetermined area.
 Present were a Priority paramedic, Mr. Samuel, and two other people in civilian clothing. Mr. Samuel then looked at him and stated that this patient is being very combative and we have to restrain him. He was informed that before he arrived Mr. Rathey had bitten Paramedic Savoy on her leg and was forcefully striking his head into the door leading to the food preparation area repeatedly, while thrashing his arms and legs very violently, and screaming loudly.
 Based on Mr. Samuel's recommendation and his personal observations and in order to prevent Mr. Rathey from injuring himself or others any further, he removed his handcuffs and stepped in. As he approached Mr. Rathey to handcuff him for his safety and others, he assessed Mr. Rathey to be in a highly combative, agitated, and potentially dangerous state. He requested another unit (which was responding) to expedite their response.
 For the safety of all involved, he, with great difficulty and with some assistance, handcuffed (double locked) Mr. Rathey in the prone position.

*454  While he was attempting to handcuff Mr. Rathey, Deputy Acosta arrived on the scene, to render assistance. Deputy Acosta then returned to his police unit to retrieve leg irons because although handcuffed Mr. Rathey continued to display very violent and combative behavior. Deputy Acosta returned and placed the leg irons on Mr. Rathey's ankles. At this point Mr. Rathey continued to thrash violently.
 He and Deputy Acosta, with Mr. Samuel's assistance, attached the handcuffs to the leg iron chains with another pair of handcuffs (i.e., they hog-tied him).
Mrs. Rathey's version of what occurred when the deputies arrived varied from that of the other witnesses. According to Mrs. Rathey, three (all the other witnesses said two) deputies arrived and one of them stated "I think this man is either on dope or alcohol." After she informed them that this was not the case, the deputies then retrieved handcuffs and shackles and put them on Mr. Rathey in three steps; to-wit: first, they handcuffed his wrists together behind his back; second, they placed shackles on his ankles; and third, they hog-tied him together. She testified that there was no delay between the three steps.
After the deputies and Mr. Samuel restrained Mr. Rathey with the hard restraints (i.e., handcuffs and shackles), they placed him on the stretcher Ms. Savoy had brought into McDonald's and rolled him out to the ambulance. According to Deputy Perzichilli's report, Mr. Rathey was "gently and with due regards to the restraints placed on the stretcher." Likewise, Mr. Samuel testified that he "vaguely remember[ed] us being extremely careful and having somebody at each  one person at each shoulder and one person at each hip and ... picking him up as a team and moving him over from where he was on the floor at the McDonald's onto the stretcher." Neither Mr. Samuel nor Ms. Savoy recalled whether Mr. Rathey was restrained with leg and wrist restraints at that time. However, Ms. Savoy testified that it would have been impossible for Mr. Rathey to have been hog-tied on the stretcher because "[h]e would have never fit on the stretcher with the [two] straps [on the gurney] and the straps were on him."
Deputy Acosta testified that after they placed Mr. Rathey on the gurney inside McDonald's they connected him to the gurney. When asked if the restraining devices were removed, Deputy Acosta explained that the restraints were not removed; rather, the handcuffs were disconnected and re-hooked back to the gurney. Deputy Acosta further testified that it "would be practically impossible" for them to get Mr. Rathey onto the gurney with the third set of irons (i.e., hogtied) on him. Deputy Acosta still further testified that they placed Mr. Rathey face up on the gurney.[13]
When the deputies arrived, Mr. Lasseigne testified that his manager required *455 all the McDonald's employees to return to work. Mr. Lasseigne testified that he did not witness Mr. Rathey being handcuffed and shackled, but he knew that Mr. Rathey lost one shoe in the process of being restrained. Mr. Lasseigne also testified that he witnessed the EMTs and deputies roll the stretcher out of McDonald's with Mr. Rathey on it. Although Mr. Lasseigne recalled that Mr. Rathey was handcuffed, he did not recall that he was hog-tied. Mr. Lasseigne also testified that during the entire time that the EMTs were at McDonald's, they were not rough with Mr. Rathey. He further testified that he did not see the EMTs use any excessive or strong-arm method. According to Mr. Lasseigne, the EMTs were just trying to help Mr. Rathey.
Contrary to the testimony of all the other witnesses, Mrs. Rathey testified that she never saw the deputies or EMTs bring a stretcher inside McDonald's. Rather, she testified that the deputies and EMTs physically picked Mr. Rathey up, carried him out of McDonald's, and placed him on the stretcher that was located inside the ambulance. However, in her deposition, she stated that she did not see how they moved Mr. Rathey to or from the ambulance. When questioned about the inconsistency, she maintained that she saw them physically carry him out and place him on the gurney in the ambulance. She also maintained that the placed him on the gurney on his stomach. According to Mrs. Rathey, Mr. Rathey still had all the restraints on him, and his wrists and ankles were bleeding. However, she acknowledged that she was not allowed to ride with Mr. Rathey in the ambulance to CMC.
While the deputies and EMTs were exiting the McDonald's and rolling the stretcher out to the ambulance, Mr. Rathey's stepson, David Laurente, and his wife arrived at McDonald's. As noted, Ms. Stanton, at Mrs. Rathey's request, had called them at the same time she called 911 and informed them of Mr. Rathey's medical emergency. Mr. Laurente testified that his stepfather was on the stretcher "laying on his belly and his hands was behind his back and his feet were pulled up to his hands and he was ... bleeding around his hands." He expressly denied that his stepfather was placed on the stretcher on his back. Like Mrs. Rathey, Mr. Laurente testified that none of Mr. Rathey's family members was allowed to ride with him in the ambulance.
According to the Priority run report, at 1:48 p.m., the EMTs departed McDonald's en route to CMC, and at 1:50 p.m., two minutes later, they arrived at CMC. Although once in the ambulance the EMTs ordinarily would have tried to initiate advance level care, Mr. Samuel testified that he determined it was too difficult to try to do anything other than to just transport Mr. Rathey to CMC, which was located less than a mile away from McDonald's. He explained that he "felt like it was better to just cut our losses and just head that one mile up to the emergency room, rather than try to put him on oxygen and start IV and call the doctor for orders and give him medication."[14] He further explained that to do those things would have taken an additional fifteen to twenty minutes, whereas, they could arrive at CMC in about a minute or two. As a result, during the entire eighteen-minute interval between their arrival at the McDonald's *456 and their arrival at CMC, the EMTs provided no medical treatment to Mr. Rathey.
Deputy Perzichilli's report states that he met the ambulance at the CMC emergency room entrance, and he assisted the EMTs to wheel Mr. Rathey into the examining room. Shortly after arriving at CMC, Mr. Rathey's behavior changed, and he became calm. At that point, both deputies assisted in removing the hard restraints. Deputy Perzichilli spoke with the emergency room nurse, who informed him that Mr. Rathey had been treated for seizure disorders in the past. According to Deputy Perzichilli this was the first notice he had of Mr. Rathey's seizure disorder.
Deputy Acosta visited with the Ratheys in the hospital that day. According to Deputy Acosta, he briefly apologized to Mr. Rathey for having to restrain him in that manner. He testified that he did not want Mr. Rathey to feel like he was a criminal or that he was under arrest. After he shook hands with the Ratheys, Deputy Acosta testified that he left the hospital. The Ratheys likewise testified that they spoke with Deputy Acosta at the hospital; Mrs. Rathey testified that "[h]e came and sit in the room with us, and he sat on the edge of the bed and talked with us."
According to Mr. Rathey, he remembers waking up in a hospital bed unrestrained with his wife, her three daughters, and her son, Mr. Laurente, present. He has very little recall of what occurred at McDonald's that day. Indeed, his only recollections are his wife leaving the table to go to the bathroom and a momentary recollection of Mr. Samuel's knee in his back while he was handcuffed and shackled.
According to the emergency room records, the restraints that were on Mr. Rathey when he arrived at CMC were handcuffs and shackles; no mention is made of Mr. Rathey being hog-tied. Dr. Domangue, the treating emergency room physician, testified that, according to the nurses' notes, the handcuffs and shackles were removed from Mr. Rathey while he was in the emergency room. Dr. Domangue further testified that the emergency room records reflect that at the time Mr. Rathey had the seizure at a local restaurant he was combative and was "somewhat postictal and confused." Dr. Domangue defined postictal as meaning:
"[A] period after which when people have seizures, they end up going into a comatose state when they're not responsive, they're very tired because of the amount of energy that was expended on the seizure. That period sometimes lasts for five to 20 minutes and is perfectly normal after a seizure."
Dr. Domangue testified that when he saw Mr. Rathey in the emergency room he was not postictal.
On that emergency room visit, Dr. Domangue's diagnosis was seizure disorder. As noted above, the tests results established that on that date Mr. Rathey's anti-seizure medication (i.e., Dilantin) level was sub-therapeutic. Describing Mr. Rathey's injuries, Dr. Domangue stated that he had abrasions on his wrists, ankles, and tongue and that he had some dry blood on his face. He further stated that on that initial visit Mr. Rathey did not complain of wrist, neck, back, or rib pain.
On 2 April 1995 at 1:40 a.m., Mr. Rathey returned to the CMC emergency room, where Dr. Domangue again was the treating emergency room physician. On that visit, Mr. Rathey's primary complaint was rib pain; and he was diagnosed as having a contusion of the rib cage. The records from that second visit indicate Mr. Rathey was calm and cooperative, but Mrs. Rathey was angry and aggressive and reported that Mr. Rathey was "abused by the sheriffs *457 when brought from McDonald's." Given the proximity of the two emergency room visits, Dr. Domangue testified that he would assume the rib injury was related to the earlier McDonald's incident.

I.
Priority's first assignment of error is that it was legal error for the trial court, after correctly instructing the jury that a gross negligence standard of care applied pursuant to La. R.S. 40:1233 A(1), to submit the negligence interrogatory  "Do you find Priority EMS personnel negligently failed to follow the Priority EMS protocol?"  to the jury. The Ratheys counter that the immunity statute does not grant EMTs a blanket immunity; rather, it grants them only a qualified immunity. Continuing, the Ratheys emphasize that the immunity applies only if certain factual predicates are satisfied and that the negligence interrogatory was necessary in order for the jury to decide whether those factual predicates were satisfied in this case.
The confusion in this case arises because of the fundamental nature of an immunity defense. Although immunity is usually treated as an affirmative defense that the defendant must plead and prove, immunity fundamentally is also "one aspect of the `this plaintiff/this defendant/these damages/this manner' question, which permeates tort law and is dealt with at the duty-or-legal-cause level of analysis." Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law § 11-1 (1996)("Louisiana Tort Law").
Seeking to have the issue of whether the immunity applied resolved pre-trial, the Ratheys filed two motions for summary judgment. Opposing those motions, Priority argued that the application of the immunity was a factual question that should be submitted to the jury. Agreeing with Priority, the trial court denied both the Ratheys' summary judgment motions. Because of the importance of this issue, the Ratheys reurged their motion for summary judgment at the commencement of the trial. In so doing, the Ratheys' counsel explained the significance of this issue, stating "without this affirmative defense for which the defendants bear the ultimate burden of proof, they cannot argue a gross negligence standard, so this affects the presentation of evidence and the arguments of counsel as to whether this is a negligence or gross negligence case."[15]
Initially, the trial court resolved this issue in Priority's favor and thus instructed the jury that the qualified immunity applied and that Priority's liability was to be determined based on a gross negligence standard. In response, the Ratheys' counsel not only objected, but also suggested that the trial court needed to submit the negligence interrogatory to the jury. As the Ratheys' suggested, the trial court submitted the negligence interrogatory. By doing so, the trial court, in effect, returned to its original opinion that the application of the immunity in this case could not be resolved as a matter of law; rather, it required the resolution of factual issues by the jury.
When the proper standard of care depends upon which version of facts the jury accepts, it is appropriate for the trial court to "instruct the jury to determine the facts and then apply the appropriate standard." 1 Dan B. Dobbs, The Law of Torts § 149 (2001). Such is the case here. The trial court's ultimate decision to submit the negligence interrogatory was prompted by its *458 implicit determination that the application of the immunity statute presented a mixed question of fact and law. See Browning v. West Calcasieu Cameron Hosp., 2003-332, p. 10 (La.App. 3 Cir. 11/12/03), 865 So.2d 795, 804, writ denied, XXXX-XXXX (La.2/13/04), 867 So.2d 691 (finding factual disputes regarding whether EMTs followed protocols precluded summary judgment and required "trier of fact to resolve this issue at a trial on the merits.") The trial court thus did not err in submitting the negligence interrogatory to the jury.
Priority argues that the trial court legally erred in submitting the negligence interrogatory without an accompanying jury instruction on negligence as it pertains to the EMTs. Priority further argues that this legal error confused the jury, interdicted the jury's fact-finding process, affected the outcome of the case, and thus mandates we conduct a de novo review. See Bujol v. Entergy Services, Inc., XXXX-XXXX and XXXX-XXXX (La.5/25/04), ___ So.2d ___, 2004 WL 1157413, (holding the prejudicial failure to instruct the jury on law applicable to an issue mandated a de novo review); see also Held v. Aubert, XXXX-XXXX (La.App. 1 Cir. 5/9/03), 845 So.2d 625. Labeling this failure to give an accompanying negligence charge a fundamental error, Priority contends that it was not required to object to this error in order to preserve this issue for appeal. See Jones v. Peyton Place, Inc., 95-0574, p. 4 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 761.
Countering, the Ratheys contend this argument should be rejected for two reasons. First, citing La. C.C.P. art. 1793, they argue that Priority did not preserve this issue regarding the jury instructions for appeal by timely lodging a specific objection at trial.[16] Second, they contend that even if the issue was preserved for appeal, the trial court properly instructed the jury on the elements that govern their negligence claim.
We find the Ratheys' argument that Priority failed to preserve this issue for appeal unpersuasive. The need for a negligence instruction was prompted solely by the trial court's decision to give the negligence interrogatory, which the Ratheys' counsel requested. Priority's position consistently has been that the trial court properly instructed the jury that the qualified immunity applied, making this a gross negligence case (i.e., that gross negligence was the applicable standard of care). Given the intertwined relationship between the jury interrogatory and instructions, logic and fairness dictate that Priority be allowed to urge this issue on appeal. Under the unique circumstances presented here, Priority preserved this issue by objecting to the submission of the negligence interrogatory. It was the trial court's ultimate decision to submit the negligence interrogatory to the jury that prompted Priority's objection to the trial court's failure to instruct the jury on negligence. We thus turn to Priority's argument that the manifest error standard is not applicable and that a de novo review is mandated due to the trial court's failure to instruct the jury on negligence as it pertains to the EMTs.
The manifest error rule assumes that the jury, as the trier of fact, applied the correct law. If the jury applied the *459 incorrect law because of erroneous jury instructions, then the court of appeal must determine if the error could have affected the jury's decision. If so, the manifest error standard does not apply; rather, the de novo standard applies. See 1 Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise, Civil Procedure § 14.14 (1999); Campo v. Correa, 2001-2707, p. 10 (La.6/21/02), 828 So.2d 502, 510 (holding that manifest error standard does not apply when one or more trial court legal errors interdict the fact-finding process); Guidry v. Bank of LaPlace, 94-1758, p. 9 (La.App. 4 Cir. 9/15/95), 661 So.2d 1052, 1058 (finding de novo review warranted given that jury instructions and interrogatories were tainted with prejudicial legal errors).
In determining whether an erroneous jury instruction warrants a de novo review, an appellate court should consider the circumstances of the case and the instructions as a whole, and should measure the "gravity or degree of error." Jones v. Liberty Mutual Ins. Co., 568 So.2d 1091, 1094 (La.App. 5th Cir.1990). "[T]he manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts." Id."Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice." Nicholas v. Allstate Ins. Co., 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023.
Viewed as a whole, we cannot say that the jury instructions were so incorrect or inadequate as to have precluded the jury from reaching a verdict based on the law and facts. The trial court instructed the jury on the duty-risk elements.[17] Both ordinary negligence and gross negligence are analyzed under a duty-risk analysis. Indeed, negligence and gross negligence are simply two types of fault, which both fall under La. C.C. art. 2315. See Louisiana Tort Law, supra at § 1-2 (noting that negligence and gross negligence can be viewed as simply two points on an imaginary fault line).[18] Moreover, in *460 the jury instructions, the trial court defined gross negligence by explaining that gross negligence "falls somewhere in the range between ordinary negligence and intentional conduct" and that it is "conduct which falls below that which is expected of a reasonably careful person under like circumstances [(i.e., ordinary negligence)]." The trial court also explained to the jury the meaning of ordinary negligence in charging them on comparative fault. Hence, the jury instructions included multiple references to and explanations of ordinary negligence.
In Ambrose v. New Orleans Police Dep't Ambulance Service, 627 So.2d 233, 242-43 (La.App. 4th Cir.1993), rev'd on other grounds, 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216, the Louisiana Supreme Court addressed a strikingly similar, albeit converse, issue regarding the adequacy of the jury instructions as to the EMT-defendants. Sandwiched between the trial court's references to the plaintiff's burden to prove "negligence" and "fault", the trial court read La. R.S. 40:1235 (now La. R.S. 40:1233) to the jury. The jury interrogatories asked the jury to determine if the EMT-defendants were grossly negligent, yet the trial court failed to instruct the jury on gross negligence or the meaning of gross negligence. In categorizing the jury instructions as a whole as "at least arguably seriously misleading," the Court reasoned "[t]hat absence [of gross negligence] from the charge would take on less significance (perhaps the jury could understand the meaning from the very words `gross' and `negligence') if it were not for the inclusion within the charge of four or five distinct references simply to negligence and fault." Ambrose, 93-3099 at p. 7, 639 So.2d at 220. The Court nonetheless declined to depart from the manifest error standard based on two factors: first, the trial court read the qualified immunity statute, which sets for the gross negligence standard, to the jury; and, second, the defendants' attorney unquestionably argued to the jury the significance of finding gross negligence as opposed to ordinary negligence. Id.
In contrast to Ambrose, in this case we can say that the absence from the jury charge of an explanation of the meaning of ordinary negligence as it applies to the EMTs takes on less significance for two reasons. First, as the Ratheys emphasize, a jury's finding of gross negligence subsumes a finding of ordinary negligence. Second, as explained above, the jury instructions in this case contrast gross and ordinary negligence and explain ordinary negligence in discussing comparative fault. Furthermore, both factors the court in Ambrose relied upon in refusing to depart from the manifest error standard are present here; to-wit: first, the trial court read the qualified immunity statute to the jury; and, second, the Ratheys' counsel argued to the jury that if Priority's EMTs were not following the instructions of a physician (or protocol), the qualified immunity (gross negligence standard) does not apply; *461 the ordinary negligence standard applies.
For these reasons, we find the jury instructions, taken as a whole, cannot be said to have "misled the jury to the extent it was prevented from dispensing justice." Nicholas, 99-2522 at p. 8, 765 So.2d at 1023. We thus find Priority's argument that a de novo review is required in this case unpersuasive. Before turning to the issue of whether the jury's finding of fault on Priority's part is manifestly erroneous, we must first determine whether the qualified immunity applies.
Priority contends that the liability of its EMTs is governed by La. R.S. 40:1233 A(1), quoting the following language from Ambrose: "[i]t is not enough for plaintiffs to prove simply that the EMTs acted negligently. Plaintiffs here must prove that defendants' actions or omissions were grossly negligent or intentionally designed to harm." Ambrose, 93-3099 at p. 5, 639 So.2d at 219; see also Haynes v. Calcasieu Medical Transp., Inc., 97-300 (La.App. 3 Cir. 10/29/97), 702 So.2d 1024. However, in both Ambrose and Haynes, the court assumed the applicability of the qualified immunity and thus did not address the requirements for invoking the immunity.[19] In this case, however, the applicability of the qualified immunity has been disputed; hence, the requirements must be addressed.
By enacting La. R.S. 40:1233 A(1), the Legislature granted EMTs a qualified immunity for liability from ordinary negligence claims; this immunity does not cover intentional or grossly negligent acts or omissions. The Legislature further conditioned this immunity by limiting its application to circumstances in which EMTs are both (i) rendering emergency medical care to an individual while in the performance of their medical duties, and (ii) following the instructions of a physician. Kyser v. Metro Ambulance, Inc., 33,600, p. 6 (La.App. 2 Cir. 6/21/00), 764 So.2d 215, 219.
In this case, the factual dispute over the application of the immunity has centered on whether the requirement that the EMTs be "following the instruction of a physician" was satisfied.[20] Given the trial court, by submitting the negligence interrogatory to the jury, essentially returned to its pre-trial position on the immunity issue, we find it insightful in deciding this issue to begin with the trial court's written reasons for denying the Ratheys' two summary judgment motions; particularly, the trial court gave the following verbatim reasons:
For the immunity under R.S. 40:1233(A)(1) to apply, the emergency *462 medical personnel must be following the instructions of a physician. The recognized exception to this rule is where emergency medical personnel are following an approved and established medical protocol.
Evidence provided to the Court thus far suggests that the Priority EMT's were following the established protocol for dealing with combative patients, i.e., contacting law enforcement officials for assistance. Whether the EMT's violated protocol by not calling a physician or whether they violated protocol by taking an active role in the use of the hard restraints used on Mr. Rathey, are questions of fact to be decided at trial.
Legally, the trial court's reference to a "protocol" exception to the requirement that the EMT be following the instructions of a physician is based on well-settled jurisprudence. Discussing that exception (although not calling it an exception), we recently noted that "[i]n Ambrose . . . this court held that an emergency room technician was considered to have been following the instructions of a physician, pursuant to R.S. 40:1235(A), whether he had received those instructions via electronic means or he was following a `protocol,' defined as a prescribed set of instructions established by physicians of the Orleans Parish Medical Society." Johnson v. Foti, XXXX-XXXX, p. 5 (La.App. 4 Cir. 4/9/03), 844 So.2d 1050, 1054. Likewise, another court defined "protocol" in this context to mean "a set of medical orders for life-threatening situations that EMTs encounter on a routine basis, as established by the Department of Emergency Medical Services, approved by the parish medical society, and distributed to hospitals and individual EMTs." Falkowski v. Maurus, 637 So.2d 522, 526 (La.App. 1 Cir.1993).
This narrow definition of protocol as encompassing only an approved set of medical orders for life-threatening situations EMTs encounter on a routine basis is consistent with La. R.S. 40:1234, which lists thirteen life-threatening situations (one of which is active seizure) in which an EMT may render services "in accordance with a protocol that shall be established by the emergency medical services committee or the executive committee of the parish or component medical society, or its designee, until voice or telemetered electrocardiogram communication can be established at the earliest possible time." La. R.S. 40:1234 E(1) and (2)(m)(emphasis supplied).
Narrowly construing the term protocol also is consistent with the principle that an immunity statute should be strictly construed. Immunity statutes serve to deny recovery to a tort victim injured as a result of a tortfeasor's conduct. Louisiana Tort Law, supra at § 11-1. Immunity statutes should thus be given a circumscribed construction consistent with their purpose. DeTarquino v. City of Jersey City, 352 N.J.Super. 450, 455, 800 A.2d 255, 258 (App.Div.2002). The Legislature's purpose in enacting this immunity apparently was to recognize that "such emergency services pose a higher risk of error than the performance of the same services by a licensed physician in a hospital and therefore that emergency medical personnel should not be inhibited in performing those services by fear of tort liability." DeTarquino, 352 N.J.Super. at 456, 800 A.2d at 258-59.[21] Stated otherwise, *463 the Legislature recognized the reality that "the performance of medical services in the field under emergency circumstances is indisputably more difficult than in a properly equipped, pristine emergency room." Falkowski v. Maurus, 637 So.2d 522, 527 (La.App. 1 Cir.1993).
Given the above narrow definition of "protocol," the trial court's reference in its written reasons to Priority's rule on dealing with violent and abusive patients as a "protocol" is inaccurate.[22] Indeed, Jan Boatwright, an owner of Priority, testified that this rule for handling violent or abusive patients is contained in Priority's "EMS Operations Response Guidelines & Treatment Protocols," but it is not a protocol. Instead, she characterized this rule as an internal policy. She explained that a protocol is approved by physicians, whereas, a policy is not. She further explained that St. Bernard Parish instructs Priority's EMTs to utilize the Orleans Parish protocols. More precisely, she explained that Dr. Domangue, as the head of EMS Committee of the St. Bernard Medical Society, instructs Priority to use the same protocols as approved by the Orleans Parish Medical Society.
Ms. Boatwright testified that one such protocol that was in place at the time was for a patient experiencing an active seizure.[23] Ms. Boatwright opined that this protocol would apply if the patient's chief complaint is active seizure. In Mr. Rathey's case, however, she explained that the EMTs were unable to follow that protocol because they were unable to apply oxygen or start an IV. She further explained that "wouldn't mean they didn't attempt to adhere to the protocol. That would mean that they were unable to adhere to the protocol because the patient was uncooperative."
Mr. Samuel similarly testified that, as team leader, he determined that Priority's protocol for active seizure applied and attempted to implement it; however, Mr. Rathey's combative behavior made it impossible to do so. Explaining what actions he took in attending to Mr. Rathey, Mr. Samuel testified that he took his pulse; determined his respiratory rate; assessed his skin color to be cyanotic, which means *464 turning a little pale or a little blue; determined his airway to be clear; and attempted to take his blood pressure. Mr. Samuel, however, testified that he was unable to either apply oxygen or start an IV because Mr. Rathey was too combative.
Priority's position appears to be that because its EMTs were attempting to provide emergency care and because its EMTs were unable to implement the seizure protocol, the immunity applies. The Ratheys' counter position is that because Priority's EMTs were not following the seizure protocol and because its EMTs did not call a physician until they were en route to CMC, the immunity does not apply.
Under the circumstances presented at McDonald's of a patient having an atypical seizure, the Priority's EMTs' determination that the seizure protocol could not be followed was reasonable. However, once Mr. Samuel, the EMT team leader, made that determination and satisfied himself that the situation, although serious, was not life threatening, he should have called a physician for instructions. Because neither he nor Ms. Savoy did so,[24] the qualified immunity provision is not applicable to Mr. Samuel's decision that the police should use handcuffs to restrain Mr. Rathey. We now turn to the issue of whether the jury was manifestly erroneous in finding Priority negligent.

II.
Priority's second assignment of error is that the record is devoid of any reasonable factual basis supporting the jury's finding that its EMTs were negligent. Priority contends that instead of factual support the Ratheys resort solely to an argument based on their erroneous reading of its seizure protocol and policy for handling violent and abusive patients. According to Priority, the Ratheys erroneously read its protocol and policy as prohibiting the use of hard restraints (such as handcuffs) and mandating the use of soft restraints (such as bandages, Kerlex (i.e., a particular type of ace bandage), blankets, sheets, towels, gauze, or the leather restraints on the gurney). Given the circumstances they were presented with at McDonald's, Priority contends that its EMTs were not negligent because they: (i) followed the applicable protocol and policy; (ii) followed their training; (iii) did the best they could under the circumstances; and (iv) met or exceeded their duty to a violent or abusive patient by calling for law enforcement assistance and, out of necessity to protect themselves and the patient, requested the deputies use hard restraints (i.e., handcuffs) to restrain Mr. Rathey and then promptly transported him to CMC.
The Ratheys counter that Priority's EMTs were negligent in failing to follow the applicable protocol and policy, which mandated the use of soft restraints. The Ratheys further counter that soft restraints were the recommended restraining device, were readily available to the EMTs, and would not have caused injury to the patient. They contend that the EMTs also were negligent in failing to follow the escalation of force principle (i.e., starting with the least amount of force and moving up step by step). The Ratheys thus contend that the record supports the jury's finding of negligence on the part of Priority.
Before analyzing the issue of Priority's negligence, we first clarify three significant points that narrow this issue. First, the record reflects that Priority's EMTs only participated in the decision to handcuff *465 Mr. Rathey; they did not participate in the decision regarding the manner in which the deputies further restrained Mr. Rathey (i.e., by shackling and hog-tying him). As noted, the Ratheys' suggestion that Mr. Samuel instructed Deputy Acosta when he arrived at McDonald's to go back to his unit and retrieve his shackles is not supported by the record. Our analysis is thus narrowed to the EMTs' participation in the handcuffing decision.
Second, the record establishes that it was not feasible for the EMTs to implement the seizure protocol due to Mr. Rathey's combative conduct. Although the EMTs' failure to follow the seizure protocol rendered the qualified immunity inapplicable, it did not necessarily render the EMTs negligent. Particularly, the Ratheys contend that the EMTs violated the seizure protocol provision requiring the use of passive restraints (i.e., soft restraints) to protect a patient's airways. However, Mr. Samuel testified that Mr. Rathey's airway was clear. Moreover, given Mr. Rathey's combative conduct, it was not feasible for the EMTs to implement this protocol. Rather, the record reflects that the applicable provision was Priority's policy for handling violent and abusive patients. We thus find the protocol inapposite to our analysis of Priority's negligence.
Third, as the Ratheys' counsel at oral argument conceded, this is not an EMT malpractice case. Although this is a case against EMTs that arises out of their attempt to provide emergency medical care, the claims asserted in this case do not fit within any of the common categories of EMT malpractice cases, which include: "dispatch problems, length of response time, and quality of care." Carrie Ovey Wiggins, Ambulance Malpractice and Immunity: Can a Plaintiff Ever Prevail?, 24 J. Legal Med. 359, 361 (2003). Priority's EMTs arrived promptly at McDonald's. During the entire eighteen minutes they attended to Mr. Rathey, the Priority EMTs provided no medical treatment to him. The Ratheys do not complain about the EMTs failure to provide medical treatment or about the adequacy of the EMTs' equipment. Rather, the Ratheys complain that the EMTs failed to follow Priority's own written policy regarding the manner in which to restrain a violent and abusive patient (i.e., with soft restraints). It follows that this is simply a negligence action.
As noted in discussing the jury interrogatories, this negligence action is governed by the duty-risk analysis. Under that analysis, it is necessary to decide the duties owed by the respective parties. In a negligence action, the defendant generally has an "almost universal legal duty" to conform to the standard of conduct of a reasonable person under like circumstances. Joseph v. Dickerson, 99-1046, 99-1188, p. 7 (La.1/19/2000), 754 So.2d 912, 916. Whether a legal duty exists, and the extent of such duty, is dependent upon the facts and circumstances of the case and the relationship between the parties. Id. The source of duty in this case, as the Ratheys emphasize, is Priority's policy for handling violent and abusive patients, which provided:
Occasionally patients may become violent or abusive. The following should be considered:
a. Remove self from conflict and enlist [sic] the assistance of law enforcement officials.
b. Patient restraining procedures may be utilized as necessary to prevent the person from injuries self or others:
1. Soft restraints Kerlex, etc., when used to immobilize a patient's extremities; must be continuously monitored to insure proper circulation.
This policy was set forth in Priority's "EMS Operations Response Guidelines & *466 Treatment Protocols." This policy provided the EMTs with a guideline and standard of care that they were required to follow when responding to a 911 call. See Browning, 2003-332 at p. 12, 865 So.2d at 805 (finding similar EMT policy to provide a standard of care and analogizing such a policy to a hospital by-law).
By answering the negligence interrogatory in the affirmative, the jury found Priority negligent. Stated otherwise, the jury found that Priority's EMTs "negligently failed to follow the Priority EMS protocol." Although the negligence interrogatory referred to "protocol," both the trial court and the parties used that term in the broad sense as encompassing not only the seizure protocol, but also the policy at issue. Indeed, the Rathey's counsel's argument was that the EMTs were required to follow policy when they were not following protocol. We thus construe the jury's answer to the interrogatory at issue as a finding that the EMTs were negligent in failing to follow this policy. The narrow question presented is thus whether the record supports that negligence finding.
At trial, Ms. Boatwright, an owner of Priority, testified as both a fact witness and as the sole expert witness on emergency medical care. As a fact witness, she testified that she was the primary stockholder of Priority. At the time of the McDonald's incident, she testified that Mr. Samuel was employed by Priority as a part-time EMT-paramedic, and Ms. Savoy was employed as a full-time EMT-intermediate. At the time of trial, Mr. Samuel was no longer employed; Ms. Savoy was still employed.
The trial court qualified Ms. Boatwright as an expert in three areas: (i) as an emergency nurse, (ii) as an EMT administrator, and (iii) as the person who composed and typed Priority's policies contained in its "EMS Operations Response Guidelines & Treatment Protocols." To compose that policy and procedure manual that was in effect in 1995, Ms. Boatwright testified that she utilized policies created by other ambulance providers in the nation. She identified the provision in the manual applicable to the McDonald's incident as the policy for handling violent and abusive patients. She further testified that this policy, which uses the term "consider," was not designed to be a hard and fast rule that has to be followed every time; rather, Priority's EMTs are trained to exercise their judgment and to be independent thinkers. She explained that during their orientation and annual training, Priority's EMTs are taught to do whatever they need to do based on their safety and the patient's care.
In exercising their judgment, Ms. Boatwright testified that the EMTs are trained to follow a list of priorities. The first priority on the list is the EMTs own safety. She explained that if an EMT becomes injured, the EMT could not do anything for anyone else; "we would have two patients." The second priority is care of bystanders and the patient. In addition to being trained to assure the safety of others and themselves, the EMTs are trained to call for law enforcement assistance when necessary. Indeed, the policy at issue expressly provides that the EMTs may consider enlisting the assistance of law enforcement officers when dealing with a violent and abusive patient.
When the EMTs exercise their judgment and enlist law enforcement assistance, Ms. Boatwright testified that the EMTs and law enforcement officers are each in control of their own aspect of the scene; that is, "if the medical care is being questioned, then the paramedic would be in control. If the restraint of a patient is in question, then the law enforcement would be in control." But, "when it comes *467 to judgment calls with respect to restraining a patient when both the Sheriff's Office and Priority EMS are on the scene," Ms. Boatwright opined that it would be a "joint decision."
Explaining the reference in the policy to Kerlex as an example of a soft restraint, Ms. Boatwright testified that Kerlex is "a mesh gauze that's very pliable, stretchable, usually used, actually, to secure bandages in place, to hold IV lines in place, even to secure plastic ET tubes in place." She conceded that Kerlex is commonly used to restrain individuals; however, she explained that it is most commonly used in controlled settings, such as hospitals and nursing homes, to keep an individual from crawling out of bed or pulling out an IV or ET tube by tying their hands to the side rails of the bed. She also conceded that it would be a "smart idea" to use Kerlex if it would be successful in accomplishing the goal of restraining the patient to allow care to be provided.
At trial, Ms. Boatwright testified that the policy "absolutely" would not be violated if its EMTs determined that the circumstances required them to participate in handcuffing a patient. In her deposition, however, she testified that Priority's EMTs "absolutely" should not participate in handcuffing people and that only law enforcement officers are authorized by state law to do so. When cross-examined regarding her contrary deposition testimony, she replied that she had changed her mind. Ms. Boatwright further testified that Priority's EMTs do not carry handcuffs; hence, the Sheriff's Office deputies must have provided the handcuffs they used to restrain Mr. Rathey. Although Ms. Boatwright acknowledged that escalation of force is a principle that Priority's EMTs must follow, she opined that its EMTs did not violate this principle in attending to Mr. Rathey. She similarly opined that its EMTs did the best they could in the circumstances they were faced with at McDonald's by exercising their judgment and calling for law enforcement assistance.
Mr. Samuel acknowledged that he made the decision to use handcuffs to restrain Mr. Rathey. He also acknowledged that he was not trained to use handcuffs or other types of hard restraints. Nonetheless, he testified that he believed Priority's policy allowed him to do whatever was necessary, including handcuffing, to protect himself and the patient. Mr. Samuel acknowledged that soft restraints, such as blankets, sheets, and Kerlex, were available, but he testified that such items would not have held Mr. Rathey down. Mr. Samuel explained that he was unable to hold Mr. Rathey down without the bystanders' assistance. Mr. Samuel remarked that if he had a patient tomorrow who was acting like Mr. Rathey was that day at McDonald's, he would not do anything different.
Ms. Savoy similarly testified that she did not feel that she could have done anything different. On cross-examination, she conceded that when the deputies arrived, there were four of them  two EMTs and two deputies  to restrain Mr. Rathey, who only had four extremities. Explaining why they did not try to manually restrain him, she stated that it was because he was extremely combative and strong. She further testified that the EMTs carried two Kerlex in their paramedic bag, but that "[t]here would have been no way to wrap that Kerlex around that man [Mr. Rathey] without jeopardizing everybody's safety, because the other three limbs would have been out there, swinging at us, also." For that same reason, she testified that she did not believe soft restraints would have worked to restrain him. However, she *468 acknowledged that Priority's policy instructed the EMTs to use "soft restraints."
The jury was presented with two conflicting readings of Priority's policy. Those conflicting readings were the result of Ms. Boatwright's conflicting deposition and trial testimony. Although Priority stresses her trial testimony that the policy is not a hard and fast rule and that it does not prohibit its EMTs from using hard restraints when necessary, the jury apparently found the Ratheys' contrary reading, which is supported by Ms. Boatwright's deposition testimony, persuasive. As a result, the jury found Priority's EMTs' failure to follow the policy was a breach of the applicable standard of care and thus negligent. We cannot say that the jury's finding of negligence was manifestly erroneous. Rather, we find the finding of fault on the part of Priority supported by the record for four reasons.
First, Ms. Boatwright testified in her deposition that Priority's EMTs should never participate in using handcuffs, which are a hard restraint. Second, the EMTs did not even try to use soft restraints. Although they were equipped with Kerlex and other types of soft restraints, the EMTs made no attempt to use any of those readily available restraints to subdue Mr. Rathey. Third, Priority's EMTs were neither equipped with hard restraints, nor trained in the use of such restraints. Rather, they were equipped with and trained to use soft restraints. In fact, as Ms. Boatwright testified, the EMTs had to obtain the hard restraints from the deputies. Finally, Mr. Samuel testified that he made the decision to handcuff Mr. Rathey. Also, as noted, Ms. Boatwright testified that when both the deputies and EMTs were present on the scene, it would be a "joint decision."
Although the liability of the Sheriff's Office and its deputies is not before us, Priority cites the trial court's written reasons for finding no liability on the part of the deputies as supporting a finding of no liability on the part of its EMTs. Priority argues that just as the deputies were faced with a situation in which time was of the essence and in which their use of handcuffs to restrain Mr. Rathey was reasonable, so too were its EMTs faced with the same urgent circumstances, and so too were its EMTs' actions reasonable. This comparison ignores the fundamental differences between the jobs of a law enforcement officer and an EMT.
A law enforcement officer's job is to enforce the law. Officers are trained to address situations involving combative individuals and the manner in which to restrain such individuals. Even when responding to an EMT's request for medical assistance in restraining a combative patient, "officers are enforcing the law to the extent that they are preventing the patient from injuring himself and/or the medical professionals." Daggett v. Indiana State Police, 812 N.E.2d 1151 (Ind.App.2004). Officers "cannot be expected to arrive at the scene where medical professionals are attempting to provide treatment to an individual and determine whether that person is committing an act which is punishable as a crime or whether that person is `involuntarily' resisting treatment because they have no control over their physical capacities." Daggett, 812 N.E.2d at 1153-54.
In contrast, an EMT's job is to provide medical care to the patient and "to reduce, to the extent possible, the amount of danger in which [the patient] found himself as a result of his seizure." Rivas v. City of Passaic, 365 F.3d 181, 195 (3rd Cir.2004). EMTs are there to help out in a medical emergency; if EMTs make the situation worse, they may be liable. See Frank J. Wozniak, Liability for Negligence of Ambulance Attendants, Emergency *469 Medical Technicians, and the Like, Rendering Emergency Medical Care Outside Hospital, 16 A.L.R.5th 605 (1993)(noting that suits against EMTs and their employers are likely when the emergency care they provide causes the patient further injury or death).[25] Given that we find no manifest error in the jury's finding of fault on the part of Priority, we turn to the issue of quantum.

III.
Priority's third assignment of error is that the jury abused its much discretion in awarding an excessive amount of general damages and past and future lost wages to Mr. Rathey. The Ratheys counter that all the damages awarded by the jury were reasonable.
In reviewing a general damage award, it is well settled that the abuse of discretion standard of review applies. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). Often, however, an interplay arises between the abuse of discretion and the manifest error standards of review. Dixon v. Travelers Ins. Co., XXXX-XXXX, p. 8 (La.App. 4 Cir. 4/2/03), 842 So.2d 478, 484 (citing Guillory v. Insurance Co. of North America, 96-1084, p. 1 (La.4/8/97), 692 So.2d 1029, 1036, n. 1 (Lemmon, J., concurring)). Explaining that interplay, former Justice Lemmon aptly stated:
The "much discretion" standard applies to the amount of the award of general damages. But there are often factual issues in a review of an award of general damages, such as whether a certain condition was caused by the tort. Of course, most issues decided by courts are mixed fact-law questions, and the fact determinations are reviewed under the manifest error standard.
Id. On the factual issue of whether a certain condition was caused by the tort (i.e., medical causation), the plaintiff has the burden of proving by a preponderance of the evidence that the tort more probably than not caused the claimed disabling condition. Dixon, XXXX-XXXX at p. 8, 842 So.2d at 484 (citing Peyton Place, 95-0574 at p. 12, 675 So.2d at 763). This burden is met if the medical evidence presented establishes that it is more probable than not that the condition was caused by the tort. Id.
With the above principles in mind, we must determine whether the Ratheys met their burden of proving medical causation. At trial, the two principal disabling conditions Mr. Rathey claimed he suffered as a result of the tort (i.e., the McDonald's incident) were bilateral carpel tunnel syndrome and an aggravation of a prior neck injury. Three medical experts testified: (i) Dr. Lee Domangue, the treating emergency room physician; (ii) Dr. Olson, the treating neurologist; and (iii) Dr. William Martin, the defense's sole medical expert.
Dr. Domangue testified that when Mr. Rathey presented at the emergency room on 31 March 1995, the day of the McDonald's incident, he had abrasions to his wrists, but he did not complain of back or neck pain. On 19 April 1995, nineteen days later, Mr. Rathey first presented to Dr. Olson, his treating neurologist. According to Dr. Olson's initial report, Mr. Rathey had multiple injuries; to-wit:
My initial impression was that this patient had what appeared to be partial seizures of secondary generalization of long-standing duration and an unspecified lesion affecting sensory and motor *470 functioning of the hand. Given the nature of the injury, a number of levels of involvement would possibly explain the patient's clinical picture. They range from a C6 disc herniation with a radiculopathy to a brachial plexus stretch injury to a combined median and radial nerve damage at the wrist secondary to displacement of both shoulders and axillary structures when the hands were cuffed to the feet behind the back.
Dr. Olson testified that when he initially saw Mr. Rathey, he complained of, among other things, hand pain and odd sensations involving a portion of the hands. Dr. Olson opined that Mr. Rathey had injured the medial nerve of both wrists; he noted that traumatic handcuffing is famous for that injury. Based on the testing he performed, Dr. Olson opined that Mr. Rathey had bilateral carpal tunnel syndrome, which he testified was consistent with traumatic handcuffing. Dr. Olson, however, determined that Mr. Rathey was not a candidate for surgery.
Dr. Martin, a neurologist, was retained in 2000 by the Sheriff's Office to conduct an examination of Mr. Rathey. Dr. Martin testified that when he performed that examination, Mr. Rathey had absolutely no signs of carpal tunnel syndrome; he had no numbness or tingling in his hands. Dr. Martin further testified that Dr. Olson did not test Mr. Rathey for superficial radial nerve injury (referred to as "handcuff palsy" because it is the nerve generally injured by improper handcuffing).
Given that the jury was presented with conflicting medical evidence on whether the handcuffing incident caused Mr. Rathey to have bilateral carpal tunnel syndrome, we cannot say that it was manifestly erroneous in finding the Ratheys met their burden of proving causation as to this condition. The same, however, cannot be said regarding the aggravation of the prior neck injury.
Dr. Olson testified that the hog-tying caused a significant aggravation to Mr. Rathey's already damaged cervical spine. Although testing revealed that Mr. Rathey had significant degenerative changes, Dr. Olson opined that the totality of these changes could not be related to the McDonald's incident. Dr. Olson, however, opined that an aggravation to Mr. Rathey's prior neck injury was consistent with the forces applied when he was hog-tied. Moreover, Dr. Olson testified that the neck injury was "time-dependent," meaning it was dependent upon the time interval that Mr. Rathey was placed in that position. On cross-examination, Dr. Olson testified that he assumed Mr. Rathey was restrained in that position for at least twenty minutes and that time interval would have been sufficient to cause the neck injury.[26] Both in his initial report, quoted above, and in his trial testimony, Dr. Olson related the aggravation of Mr. Rathey's prior neck injury to the hog-tying incident.[27]
Given that no evidence was presented that Priority played any part in the decision to hog-tie Mr. Rathey, we find it *471 was manifest error for the jury to relate the aggravation of his prior neck injury to Priority's negligence, which is based on its participation in the decision to use handcuffs. Our finding that Priority's negligence caused only the bilateral carpal tunnel syndrome requires us to modify the jury's general damage award. Considering this particular injury and the projected likelihood of future medical treatment to this particular plaintiff under these particular circumstances, we find $50,000 to be the highest reasonable general damages award to compensate Mr. Rathey for the bilateral carpal tunnel syndrome as well as the other minor injuries related to the handcuffing incident. (We note that Mr. Rathey has not been operated upon for his wrist injuries and it is unlikely that he will be.)
As noted, Priority also challenges the jury's award of $100,000 past lost wages, and $65,000 future lost wages or impairment of earnings capacity. Priority argues that Mr. Rathey's inability to return to work is primarily related to his epilepsy disorder, which prompted this entire incident. Indeed, Priority stresses that Mr. Rathey is on disability benefits due to his epilepsy. The Ratheys respond that Mr. Rathey's epilepsy did not affect his ability to work. They emphasize that at the time of the McDonald's incident, he was employed at the cemetery earning $13,000 a year. To establish this fact, the Ratheys introduced their income tax records.
As the Ratheys contend, the jury awards for loss of past and future wages appear to have been calculated simply by multiplying the $13,000 per year income figure, which was Mr. Rathey's earnings at the time of the incident, by the number of years between the accident and the date of trial (eight times $13,000) for past lost wages and by the number of years been the date of trial and his anticipated retirement (five times $13,000) for future lost wages. Although this mathematical calculation is appropriate for past lost wages, it is inappropriate for future lost wages. These two types of awards are subject to different standards.
As to past lost wages, the plaintiff has the burden of proving the time missed from work as a result of the injury. Reichert v. Bertucci, 96-1213, p. 5 (La.App. 4 Cir. 12/4/96), 684 So.2d 1041, 1044. "Past lost wages are susceptible of mathematical calculation, and the award is not subject to the much discretion standard." Reichert, 96-1213 at p. 5, 684 So.2d at 1044-45. As to future lost wages, which is also termed impaired earning capacity, "the plaintiff must present medical evidence which at least indicates that a residual disability causally related to the accident might exist." Myers v. Burger King Corp., 92-0400, p. 14 (La.App. 4 Cir. 5/26/94), 638 So.2d 369, 379. Future lost wages awards are "inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty." Id. "The court must exercise sound discretion in determining the award [of future lost wages or loss of earning capacity]." Reichert, 96-1213 at p. 8, 684 So.2d at 1046. In determining a proper future lost wage award, factors to be considered are: "the plaintiff's physical condition before the injury, the plaintiff's past work history and work consistency, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life." Myers, 92-0400 at pp. 14-15, 638 So.2d at 379.
For both past and future lost wages, the plaintiff is required to establish a causal connection between the disability and injury. The only evidence the Ratheys introduced that Mr. Rathey was disabled *472 from returning to work was Dr. Olson's testimony. Dr. Olson testified that Mr. Rathey was permanently disabled due to the restrictions he imposed upon him. According to Dr. Olson, those restrictions were based on two underlying causes: (1) his seizure disorder, and (2) his cervical spine problem.[28] However, neither the seizure disorder nor the cervical spine problem was related to Priority's negligence. The seizure disorder was pre-existing; indeed, it was the cause of the entire incident at issue. The cervical spine problem was related to preexisting neck injuries, which were aggravated by the hog-tying and thus not caused by Priority's negligence. Although Dr. Olson testified that Mr. Rathey has significant problems with the median nerve of both wrists, he did not relate those problems to Mr. Rathey's inability to work. For these reasons, we find the awards of $100,000 in past lost wages and $65,000 in future lost wages to be an abuse of discretion.
Summarizing, we reduce the general damage award to $50,000 and reverse the future and past lost wages awards. We also affirm all the other damage awards, which were not challenged on appeal. We now turn to the Ratheys' four assignments of error advanced in their answer to Priority's appeal.

IV.
In their first assignment of error raised by answer to appeal, the Ratheys allege that Priority's duty to provide competent emergency medical treatment encompassed the risk that Mr. Rathey might not take his anti-seizure medication and that the trial court thus erred in allowing the jury to assess fault against him.[29] In support of this contention, the Ratheys rely on the position of Professor Alston Johnson, espoused in a law review article, that duty-risk analysis tort cases can be divided into three categories; to-wit:
(a) those in which a defendant's duty extends to the protection of a plaintiff against his own carelessness;
(b) those in which a defendant is not liable because the plaintiff's conduct has produced a situation for which the law should not require a reasonably prudent person to prepare and respond; and
(c) those that fall in neither category, in which the victim's fault and the defendant's fault may each be weighed in the balance.
Alston Johnson, Comparative Negligence and the Duty/Risk Analysis, 40 La. L.Rev. 319, 333 (1980). The Ratheys contend that this is a type (a) case because the duty of Priority's EMTs to provide emergency medical treatment to Mr. Rathey encompassed the risk that Mr. Rathey might not have taken his anti-seizure medication (i.e., Dilantin), regardless the reason. The Ratheys contend that Priority's attempt to have fault allocated to Mr. Rathey is analogous to an emergency room doctor who commits malpractice in treating an auto accident victim attempting to have fault allocated to that victim for causing the motor vehicle accident. In the latter context, the Ratheys contend that clearly the doctor's duty to competently treat the victim would encompass the risk that the victim might cause a motor vehicle accident. They contend the same holds true as to Priority's EMTs' duty to provide competent emergency medical care to Mr. Rathey.
*473 Rejecting this argument that the jury should not quantify the fault of Mr. Rathey, the trial court, at the commencement of the trial, found the comparative fault issue to be a factual issue for the jury to decide for two reasons. First, the trial court noted that before Priority's EMTs arrived, Mr. Rathey was having a seizure and could have injured himself. In its brief, Priority argues this point, stressing that the evidence at trial, especially Mr. Lasseigne's testimony, establishes that before its EMTs arrived Mr. Rathey was banging his head violently against the glass door. As a result, Priority contends, as the trial court found, that a factual causation issue was presented regarding Mr. Rathey's comparative fault. Second, the trial court noted that Mr. Rathey could be at fault for failing to take his anti-seizure medication. Implicit in the latter finding was the trial court's rejection of the Ratheys' legal argument that this is a type "a" case and that it was error to allow the jury to quantify Mr. Rathey's fault.
To understand this legal argument regarding type "a" cases, it is necessary to consider the purpose for which these categories were created. These categories were created at a time, before comparative fault, when a plaintiff's contributory negligence could act as a total bar to his tort recovery. During that time, however, the jurisprudence recognized that in certain cases, as a matter of public policy, a contributorily negligent plaintiff should nonetheless recover one hundred percent of his or her damages from an at-fault defendant. "In `duty-risk' parlance, the defendant's duty to avoid his or her faulty conduct included the risk that he or she would injure a contributorily negligent plaintiff. Stated differently, the defendant had a duty to protect the plaintiff from the plaintiff's own negligence." Louisiana Tort Law, supra at § 9-5. With the adoption of comparative fault, however, the continued viability of these categories is questionable.[30]
Former Justice (then Judge) Hall aptly suggested that "most cases of the type where in the past the contributory negligence of the plaintiff was found to be within the scope of the risk encompassed in the defendant's duty and thereby not a bar to recovery [(i.e., type (a) cases)], should be treated as type `c' cases and decided under comparative negligence principles." Frain v. State Farm Insurance Co., 421 So.2d 1169, 1174-75 (La.App. 2d Cir.1982)(Hall, J. concurring); see also David W. Robertson, Ruminations on Comparative Fault, Duty-Risk Analysis, Affirmative Defenses, and Defensive Doctrines in Negligence and Strict Liability Litigation in Louisiana, 44 La. L.Rev. 1341, 1362 (1984)(noting that the most important criticism of retaining duty-risk approach to forgiving some victim fault is the potential confusion in multiparty cases). Likewise, a commentator suggested that despite the adoption of comparative negligence courts should retain the flexibility to fashion the duty-risk analysis in such a way as to impose on a defendant the duty to protect a plaintiff from their own fault in appropriate circumstances. Louisiana Tort Law, supra § 9-4. Assuming the *474 continued validity of these categories, we find this case does not present an appropriate circumstance to warrant imposing a duty on the defendant-EMTs to protect Mr. Rathey from his own fault. Stated otherwise, we find no error in the trial court's implicit finding that, under Professor Johnson's analysis, this is a type "c" case. The jury was thus properly allowed to quantify Mr. Rathey's fault.
Nor do we find manifest error in the jury's finding of fault on the part of Mr. Rathey. At trial, it was established that Mr. Rathey's Dilantin level was sub-therapeutic when he presented at CMC. Dr. Domangue testified that it was more than likely that had Mr. Rathey's Dilantin levels been in the therapeutic range, his chances of having a recurrent seizure would have been lessened. Dr. Domangue further testified that he recalled treating Mr. Rathey at CMC in 1994. At that time, Dr. Domangue testified that Mr. Rathey tried to deny that he had a previously diagnosed seizure disorder. Dr. Domangue testified that they called an out-of-state physician to obtain verification that Mr. Rathey had a previously diagnosed seizure disorder. He also testified that he recalled warning Mr. Rathey of the importance of taking his anti-seizure medication.
Although Mr. Rathey denies being warned to take his medication and although the Ratheys contend Mr. Rathey took his medication on the day of the McDonald's incident, the Priority run report states that Mr. Rathey had not taken his medication that day. Dr. Olson noted in his initial report that Mr. Rathey's sub-therapeutic Dilantin level explained the recurrence of Mr. Rathey's seizure disorder. Dr. Olson, however, testified at trial that there were various reasons that could explain a patient having a sub-therapeutic Dilantin level, such as taking a generic brand of medication.[31] He also testified that because Mr. Rathey's Dilantin level was not zero, it was impossible to determine the cause of his sub-therapeutic level. While there is some conflicting testimony on this issue, the jury reasonably could have found that Mr. Rathey's sub-therapeutic Dilantin level was caused by his not having taken his anti-seizure medication.
The jury's allocation of fault is a question of fact, which is reviewed on appeal under the manifest error standard. Petre v. State, Dep't of Trans. and Dev., XXXX-XXXX, p. 13 (La.4/3/02), 817 So.2d 1107, 1114. In allocating fault, the Watson factors apply, to-wit: 1) whether the conduct results from inadvertence or involved an awareness of the danger; 2) how great a risk was created by the conduct; 3) the significance of what was sought by the conduct; 4) the capacities of the actor, whether superior or inferior; and 5) any extenuating circumstances that might require the actor to proceed in haste, without proper thought. Petre, XXXX-XXXX at p. 13, 817 So.2d at 1114-15. Although we might have allocated fault differently, we cannot say that the jury's allocation was manifestly erroneous.[32]

V.
The Ratheys' second assignment of error raised by answer to appeal is that the trial court erred in refusing to reallocate the 10% fault apportioned to the Sheriffs' Office to the other parties on a pro-rata basis under the ratio approach enunciated *475 in Gauthier v. O'Brien, 618 So.2d 825 (La.1993). Priority counters that the Gauthier ratio approach applies only to reallocation of a statutorily immune employer's or coworker's fault in an employee's action against a third party tortfeasor. See Trahan v. Asphalt Associates, Inc., XXXX-XXXX, p. 12 (La.App. 3 Cir. 10/17/01), 800 So.2d 18, 27 (recognizing that "Gauthier ratio approach has not been extended outside of the worker's compensation-statutory immunity setting.") Continuing, Priority stresses that the sole case that has applied the Gauthier approach outside the statutorily immune employer context is Trahan. In Trahan, the ratio approach was extended to reallocate the fault of missing intentional tortfeasors based on La. C.C. art. 2323(C), which prohibits reducing a plaintiff's recovery because of an intentional tortfeasor's fault.
La. C.C. art. 2324 B read at the time of Mr. Rathey's injury as follows:
If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of this Article, all parties shall enjoy their respective rights of indemnity and contribution. Except as described in Paragraph A of this Article, or as otherwise provided by law, and hereinabove, the liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, or immunity by statute or otherwise.
In contrast, La. C.C. art. 2324B now provides:
If liability is not solidary pursuant to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
By Acts 1988, No. 373, the Louisiana Legislature partially abolished solidary liability except in a limited number of circumstances; that is, the legislature set forth a formula balancing solidary liability on the one hand and joint and several liability on the other. By Acts 1996, 1st Ex.Sess., No. 3, the legislature essentially abolished solidary liability. Gauthier is limited to reallocation of fault assigned to a statutorily immune employer or coworker's fault in an employee's action against a third party tortfeasor. Trahan notes that Gauthier has not been expanded outside of the workers' compensation-statutory immune setting.
In the case at bar, Mr. Rathey should collect 60% of his damages by virtue of the jury verdict. The 60% is greater than the 50% that the legislature wanted to
*476 assure that a plaintiff could collect from the solidarily liable tortfeasors. Ergo, we conclude that the expressed public policy of the state has been met in the case at bar; the jury set Priority's fault at 60% and this court should not disturb that allocation.[33]
In Gauthier, the Louisiana Supreme Court addressed the unique circumstances presented by a statutorily immune employer's or co-worker's fault in an employee's action against a third party tortfeasor. In that situation, the Court held that the employer's fault had to be quantified and that such fault then had to be reallocated using the ratio approach. Our review of the jurisprudence confirms the trial court's finding, and Priority's contention, that Trahan is the only case to extend the Gauthier approach outside the statutorily immune employer context. See Snearl v. Mercer, XXXX-XXXX (La.App. 1 Cir. 2/16/01), 780 So.2d 563 (applying Gauthier approach to reallocate fault of co-employee). In Trahan, the court reallocated fault based on the statutory prohibition against reducing the plaintiff's recovery due to an intentional tortfeasor's fault. We thus decline to reallocate the fault of the Sheriff's Office pro-rata to the remaining parties.[34]

VI.
The Ratheys' third assignment of error raised by answer to the appeal is that the jury erred in failing to award any loss of consortium damages to Mrs. Rathey. As the jury charges in this case reflect, the elements of loss of consortium damages include: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of felicity. A plaintiff is not required to prove every element to support an award of loss of consortium.
The trier of fact (in this case the jury) has much discretion in assessing general damages, which includes loss of consortium. Etheredge v. St. Paul Mercury Ins. Co., 35,832, p. 5 (La.App. 2 Cir. 4/3/02), 814 So.2d 119, 123. "[N]ot every physical injury will result in a loss of consortium or other general damages." Etheredge, 35,832 at p. 6, 814 So.2d at 123. An example of a refusal to find a compensable loss of consortium claim is provided in VaSalle v. Wal-Mart Stores, Inc., XXXX-XXXX (La.11/28/01), 801 So.2d 331. In VaSalle, the Louisiana Supreme Court *477 affirmed the jury's award of no loss of consortium damages to the tort victim's husband. In that case, the husband testified that after the accident his wife's injuries affected their relationship in that "they were grouchier with each other, their sex life was not as active as it once was, Ms. VaSalle was hard to live with, and he and his daughter had to perform chores Ms. VaSalle used to do." VaSalle, XXXX-XXXX at p. 14, 801 So.2d at 340.
Entitlement to loss of consortium damages is a fact question that will not be reversed on appeal absent manifest error. Marcum v. Johnston, 32, 634, p. 9 (La.App. 2 Cir. 1/26/00), 750 So.2d 1186, 1191. The burden is on the plaintiff to prove a definite loss. Thonn v. Cook, XXXX-XXXX, p. 14 (La.App. 4 Cir. 12/10/03), 863 So.2d 628, 639 (citing Quinn v. Wal-Mart Stores, Inc., 34,280 (La.App. 2 Cir. 12/6/00), 774 So.2d 1093). The dispositive issue is thus whether the jury erred in finding Mrs. Rathey failed to prove her entitlement to any general damages for loss of consortium.
As to the effect of the McDonald's incident on their life, Mrs. Rathey, who was seventy-three years old at the time this case was tried, testified that she and her husband used to enjoy going to the movies and taking trips to Lafayette. She explained that one of her children lives in Lafayette and that they would attend dances at the grandchildren's school there. Since the McDonald's incident, she stated they are unable to do these things. She explained that Mr. Rathey could not make the three-hour drive to Lafayette. She also testified that her husband used to garden and cut the grass, but is no longer able to do those things. She further testified that her husband's patience has shortened, that he gets nervous easily, that their sex life is not the same, and that they do not do things together much any more. Mr. Rathey's testimony was consistent with Mrs. Rathey's testimony on this issue.
In support of their argument that the jury erred in finding Mrs. Rathey was not entitled to loss of consortium damages, the Rathey's cite Thonn. In Thonn, this court reversed a jury finding that the plaintiff-spouse was not entitled to loss of consortium damages. In so doing, this court relied on the fact that the plaintiffs established a loss of several elements of a consortium claim. By analogy, the Ratheys claim that their testimony likewise establishes a loss of several elements of a consortium claim. We find the Ratheys' reliance on Thonn misplaced. In Thonn, we stressed that the defendants failed to cross-examine the plaintiffs on this issue or to offer any response to the plaintiffs' argument on this issue in their appellate brief. In stark contrast, Priority's counsel cross-examined the Ratheys on this issue and Priority's brief responds to this issue. As Priority stresses in its brief, Mr. Rathey acknowledged in his testimony at trial that his wife was in a wheelchair and that she had health issues unrelated to this case. We also note that Dr. Olson testified, in discussing Mr. Rathey's disability, that Mr. Rathey had significant responsibility in caring for his ailing wife. Given the facts of this case, we cannot say the jury was manifestly erroneous or abused its discretion in finding Mrs. Rathey failed to establish her entitlement to any general damages for loss of consortium.

VII.
The Ratheys' final assignment of error raised by answer to appeal is that the trial court erred in failing to assess all the court costs to Priority. The Ratheys acknowledge that La. C.C.P. art. 1920 gives a trial court great discretion in taxing court costs in any manner it deems equitable. Article 1920 provides: "the *478 court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." La. C.C.P. art. 1920. However, the Ratheys argue that the jurisprudence has established that the prevailing party should not be cast with court costs unless that party incurred additional costs pointlessly or engaged in other conduct that justified the assessment of costs against it. See Henderson v. Louisiana Downs, Inc., 566 So.2d 1059 (La.App. 2d Cir.1990). We find this argument unpersuasive. The Ratheys were found to be 30% at fault; we find no inequity in the trial court casting them with a proportionate percentage of the court costs.

CONCLUSION
For the foregoing reasons, we affirm the trial court's finding of fault on the part of Priority; reverse the $100,000 past lost wages award and the $65,000 future lost wages award; reduce to $50,000 the general damages award; and, in all other respects, affirm the judgment of the trial court.
AFFIRMED IN PART; REVERSED IN PART.
ARMSTRONG, C.J., CONCURS IN PART AND DISSENTS IN PART.
McKAY, J., CONCURS IN PART AND DISSENTS IN PART.
LOVE, J., CONCURS IN PART AND DISSENTS IN PART AND ASSIGNS REASONS.
MURRAY, JUDGE DISSENTING IN PART WITH REASONS.
ARMSTRONG, Chief Judge, concurring in part and dissenting in part.
I respectfully concur in the majority opinion with the exception of the question of the reallocation of the 10% fault attributable to the immune Sheriff's Office. As to that issue only, I respectfully dissent for the reasons assigned by Judge Murray.
McKAY, Judge, concurring in part and dissenting in part.
I concur in part and dissent in part for the reasons assigned by Judge Love.
LOVE, Judge, concurring in part, dissenting in part.
I respectfully concur in part and dissent in part. I respectfully concur with the majority on all issues except that regarding comparative fault, and quantum.
The present case presents review of a 1995 tort, which dictates the application of interpretations of La. C.C. arts. 2323 and 2324, prior to the 1996 revisions

COMPARATIVE FAULT
The majority finds that the trial court did not err in submitting Mr. Rathey's possible negligence to the jury based solely upon legal commentary and a Louisiana Court of Appeal Second Circuit concurring opinion. However, the Ratheys' case belongs in the "a" category of plaintiffs, which involves defendants who are responsible for "protecting a victim from his own carelessness." Alston Johnson, Comparative Neglegence and the Duty/Risk Analysis, 40 La.L.Rev. 319, 333 (1980). This category of fault assessment protects plaintiffs, who should be protected from their own fault, from the negligence of another party.
Pre-revision Louisiana jurisprudence adopted the application of the "a" category of plaintiffs. In Rue v. State Department of Highways, 372 So.2d 1197, 1199 (La.1979), the Louisiana Supreme Court determined that a "motorist has a right to assume" that a highway is in a "reasonably safe condition." Rue involved a plaintiff who drove off the shoulder of the road and, *479 as a result, was in an accident. Id. As a result, the Court ruled that the duty of the Department of Highway encompassed "simple inadvertence" by a driver and that he might drive partially off the shoulder. Id. Additionally, Kelly v. Messina, 318 So.2d 74, 78 (La. App. 4th Cir. 1975), held a defendant's duty of care sometimes includes anticipating the possible negligence of a plaintiff. This Court has also reiterated that, prior to the La. C.C. art. 2323 revision, a plaintiff's actions cannot be considered as contributory negligence "unless they were unreasonable in light of the circumstances." Brock v. New Orleans Public Service, Inc., 433 So.2d 1083, 1089 (La. App. 4th Cir. 1983).
Similarly, this case involves EMT's, who owe a duty to administer adequate emergency medical treatment and to protect those persons in need of emergency medical treatment from further injury. This includes protecting a patient from his or her own potential inadvertence. The possibility that Mr. Rathey did not take his anti-seizure medication on the day of the seizure was not unreasonable because even the reasonable person occasionally forgets to take his medication. Additionally, Mr. Rathey has a right to expect that EMTs will comply with their duty to administer adequate emergency medical treatment with the utmost care, regardless of the plaintiff's own conduct. Accordingly, Priority's duty to Mr. Rathey encompassed the possibility that he somehow played a part in his emergency condition.
As such, it was an error of law for the trial judge to submit the issue of the plaintiff's fault for possibly failing to take his medication to the jury. This misapplication of the law could preclude heart attack victims from full recovery if they were overweight or allow emergency room doctors to escape malpractice liability simply because a patient played a part in their own medical condition by failing to take medication or neglecting to live the healthiest lifestyle possible.

QUANTUM
Priority's negligence caused all of Mr. Rathey's damages. The majority concludes that Priority did not play a part in the decision to hog-tie Mr. Rathey. Thus, they assert that Priority is not responsible for Mr. Rathey's neck injuries. However, the Deputies hog-tied Mr. Rathey because Priority failed to implement proper protocol when dealing with a post-seizure patient. If the proper use of force, i.e. soft restraints, had been used by Priority, the St. Bernard Parish Sheriff's Office would not have made the decision to use three pair of handcuffs to hog-tie Mr. Rathey and cause his injuries; including the injuries to his neck. Additionally, Priority failed to inform the Deputies of Mr. Rathey's post-seizure condition, which could have influenced their judgment when deciding to use hard restraints. Accordingly, the jury's determination of Priority's negligence was not manifestly erroneous and the fact finders determination of quantum should not be reduced.
MURRAY, Judge, Dissenting in Part with Reasons.
I agree with the majority in all respects except for the issue of whether the 10% fault the jury allocated to the Sheriff's Office should be reallocated pro-rata to Mr. Rathey and Priority. If this tort had occurred after the 1996 amendment to La. C.C. art. 2324(B), there is no question that the trial court could not reallocate the fault of the immune defendant, i.e., the Sheriff's Office. Although the trial court found the 1996 amendment inapplicable,[1] it determined *480 that because this case involves neither a statutorily immune employer nor an intentional tortfeasor the approach espoused in Gauthier v. O'Brien, 618 So.2d 825 (La.1993) does not apply. I disagree.
In Gauthier, the Louisiana Supreme Court addressed the unique circumstances presented by a statutorily immune employer's or co-worker's fault in an employee's action against a third party tortfeasor. In that situation, the Court held that the employer's fault had to be quantified and that such fault then had to be reallocated using the ratio approach.
The Gauthier ratio approach was extended outside the employment context in Trahan v. Asphalt Associates, Inc., XXXX-XXXX, pp. 11-12 (La.App. 3 Cir. 10/17/01), 800 So.2d 18, 27. In Trahan, the Gauthier ratio approach was applied to reallocate the fault of missing intentional tortfeasors based on La. C.C. art. 2323(C), which prohibits reducing a plaintiff's recovery because of an intentional tortfeasor's fault. In so doing, the Trahan court acknowledged that its decision was a res nova one, stating that "Gauthier ratio approach has not been extended outside of the worker's compensation-statutory immunity setting." XXXX-XXXX at p. 11, 800 So.2d 18, 27.
In my opinion, Gauthier can be viewed as a broader pronouncement of the proper construction of the 1987 version of La. C.C. art. 2324(B), which was the law in effect at the time of the tort at issue in this case. I would thus find that the Gauthier ratio approach applies to this negligence action and thus reallocate the fault between the parties as follows: 66.67% to Priority and 33.33% to Mr. Rathey.
NOTES
[1] The trial court further noted that the Sheriff's Office's liability is vicarious; hence, it can only be liable if its employees are found to have violated the standards provided for in this statute.
[2] Both the trial court and the parties refer to the qualified immunity for EMTs as that set forth in La. R.S. 40:1233 A(1); however, at the time of the McDonald's incident (March 1995), this qualified immunity was designated as La. R.S. 40:1235(A), which read:

A. (1) Any basic, intermediate, or paramedic emergency medical technicians certified pursuant to the terms of the Part who render emergency medical care to a person while in the performance of his medical duties and following the instructions of a physician shall not be individually liable to such a person for civil damages as a result of acts or omissions in rendering the emergency medical care, except for acts or omissions intentionally designed to harm, or for grossly negligent acts or omissions which result in harm to such person ...
In 1997, the Legislature recodified Section 1235(A), without material change, as Section 1233 A(1). See 1997 La. Act 913, § 2. Section 1233 A(1) now provides:
Any emergency medical person certified pursuant to the provisions of this Subpart who renders emergency medical care to an individual while in the performance of his medical duties and following the instructions of a physician shall not be individually liable to such an individual for civil damages as a result of acts or omissions in rendering the emergency medical care, except for acts or omissions intentionally designed to harm, or for grossly negligent acts or omissions which result in harm to such an individual. Nothing herein shall relieve the driver of the emergency vehicle from liability arising from the operation or use of such vehicle.
Since the operative language in Section 1233 A(1) is the same as in former Section 1235(A), we, like the trial court and the parties, refer in this opinion, for ease of reference, to the qualified immunity as Section 1233 A(1).
[3] As discussed in detail elsewhere in this opinion, the qualified immunity only applies if the EMT is rendering emergency medical care while in performance of medical duties and following the instructions of a physician. The jurisprudence, however, has construed that requirement to be satisfied when an EMT is following a medical protocol. Adopting the trial court's terminology, we refer to this as the protocol exception. We also note the Ratheys' contention that the qualified immunity statute applies only to the EMTs. Another circuit has recognized that to the extent the liability of the EMTs' employer is vicarious, the immunity would apply to the employer. See Kyser v. Metro Ambulance, Inc., 33,600, p. 6 (La.App. 2 Cir. 6/21/00), 764 So.2d 215, 219. However, because we find the immunity does not apply in this case, we pretermit that issue.
[4] At trial, Dr. Lee Domangue's video deposition was introduced and played to the jury in lieu of live testimony.
[5] De La Ronde Hospital and CMC are the same physical facility; the name has been changed.
[6] When informed of the time and questioned about the length of time they had been at McDonald's before the call was placed, Mrs. Rathey replied that Ms. Stanton did not place the 911 call immediately. Mr. Lasseigne also testified that he was unsure of the time frame. He stressed that he was afraid someone was going to die.
[7] Multiple levels of certifications for emergency medical technicians exist. The relevance of the various levels is that, by statute, the level of certification dictates the extent of medical care an EMT is legally allowed to perform. See La. R.S. 40:1234.
[8] Due to Mr. Rathey's extremely combative behavior, Ms. Savoy testified that she remained inside McDonald's close to Mr. Samuel from the time they arrived until the deputies arrived. Even when she called for backup, she did so from inside McDonald's on her radio. She did not go back to the Priority unit until the deputies arrived. At that point, she went to grab the stretcher. As a result, she was not present when the deputies and Mr. Samuel placed the hard restraints on Mr. Rathey. Indeed, she testified that she first noticed that handcuffs were used to restrain him at the hospital when she "noticed the cuts on his wrists."
[9] Actually, the deputies arrived at separate times. One deputy arrived. That deputy called the backup deputy to request that he expedite his response; the backup deputy arrived within minutes.
[10] Although the Ratheys' counsel in brief and at oral argument suggested that it was Mr. Samuel who directed Deputy Acosta to retrieve his shackles, Mr. Samuel testified that he did not recall the use of leg shackles on Mr. Rathey. Moreover, the record reflects that Deputy Acosta made the decision on his own to return to his unit to retrieve his shackles.
[11] Due to Deputy Perzichilli's unavailability at trial (he had moved out of state and his whereabouts where unknown), the trial court allowed into evidence both the incident report and the handwritten report Deputy Perzichilli prepared shortly after the incident.
[12] In the incident report, Deputy Perzichilli documented the fact that Mr. Rathey bit Ms. Savoy. His report also contains the following comment:

Off[icer] responded to call of ambulance request at location, McDonald's Restaurant. Upon arrival, observed Priority EMT Samuels and 2 unidentified white males attempting to keep an extremely combative patient, subject, from injuring himself and others. Subject was located in hallway near restrooms and officer learned that subject had bitten EMT Savoy on her left leg during an apparent seizure. Off[icer] and EMT Samuels [sic] handcuffed subject after a struggle (subject was thrashing around, hitting his head on a door.) Off[icer] requested another unit for assistance, and Dep[uty] G. Acosta arrived and leg irons were placed on subject's legs to counter his kicking. Subject was still combative and a second pair handcuffs were placed connecting the first handcuffs and the leg irons. The subject, still struggling, was carefully placed on a stretcher and transported to Chalmette Med. Center for treatment. Officer learned that subject suffered from seizures and after the seizures, he gets in a postictal state.
[13] Whether Mr. Rathey was still hog-tied when he was placed on the gurney and whether he was placed face up, as opposed to face down, is significant because of the risk of positional asphyxia. This risk was noted by at least one of the law enforcement experts who testified at trial. Particularly, Victor F. Summers, III, the Ratheys' expert in police defensive tactics, testified that one problem with hog-tying is that it presents a problem in moving the person; particularly, "[i]f you place them on the gurney, they're face down or hog-tied. If you place them face up, they're laying on their bent legs and on their hands. Then you get into the aspect of positional asphyxia, where they have difficulty breathing because they're bent over backwards, and their hands are attached to their feet. So they're arched backwards and it's difficult to breathe."
[14] The EMTs did call ahead to CMC to alert the emergency room personnel to the situation and the fact that they were en route.
[15] No allegation that Priority's EMTs acted intentionally exists. Hence, the standard of care if the qualified immunity statute applies is gross negligence.
[16] La. C.C.P. art. 1793 C provides:

A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.
[17] The trial court instructed the jury as follows:

Plaintiff has alleged that he was damaged by the fault of the defendants. To prove his case, plaintiff bears the burden of proving three elements. First, the plaintiff must prove that the defendants' conduct was substandard, that the defendants breached some legal duty imposed by law to protect plaintiff against the type of harm allegedly suffered. Mere causation does not impose on the defendants liability for plaintiffs' alleged damage. Plaintiff must further prove that defendants violated a duty imposed by law to protect the plaintiff from the harm he/she allegedly sustained.
Second, plaintiff must prove that the defendants' substandard conduct was a cause in fact of harm to him. In other words, that the defendants' substandard conduct was a factor substantially contributing to the incident. In determining whether the conduct was a cause in fact of plaintiff's harm, you should ask yourself whether more likely than not, the incident would have happened anyway. If the incident would have happened despite the substandard conduct of the defendants, then that conduct should not be considered a cause. If on the other hand, defendants' conduct significantly contributed to the incident its conduct would be a cause in fact. This does not mean that defendants' conduct must have been the only cause of plaintiff's damages. Factors may act independently or together to cause harm. Plaintiff need only prove that defendants' conduct was one of the causes of his injury. Third, plaintiff must prove what damages he sustained as a result of the incident.
[18] Under a duty-risk analysis, the plaintiff has the burden of proving five elements: (i) the defendant's conduct was a cause-in-fact of the plaintiff's injuries, (2) the defendant had a duty to conform his or her conduct to a specific standard, (3) the defendant breached that duty, (4) the defendant's conduct was the legal cause of the plaintiff's injuries, and (5) actual damages. Bowman v. City of Baton Rouge/Parish of East Baton Rouge, XXXX-XXXX, p. 5 (La.App. 1 Cir. 5/9/03), 849 So.2d 622, 626-27, writ denied, XXXX-XXXX (La.10/3/03), 855 So.2d 315 (citing Joseph v. Dickerson, 99-1046, 99-1188 (La.1/19/00), 754 So.2d 912, 916).

More to the point in this case, under a duty-risk analysis of liability, one must consider the following:(1) Was the conduct of which the plaintiff complains a cause-in-fact of the resulting harm? (2) What, if any, duties were owed by the respective parties? (3) Whether the requisite duties were breached? (4) Was the risk, and harm caused, within the scope of protection afforded by the duty breached? (5) Were actual damages sustained? Pitre v. Louisiana Tech University, 95-1466, 95-1487, p. 8 (La.5/10/96), 673 So.2d 585, 589-90.
[19] Although the Louisiana Supreme Court reversed our decision on liability in Ambrose, it implicitly approved our reasoning that the limited immunity applied to the EMTs who were acting pursuant to an established medical protocol. Our reasoning was that the immunity statute at that time specifically provided that physicians could provide instructions either directly to EMTs by electronic or other means or indirectly through the issuance of protocols. We further reasoned that the EMTs in Orleans Parish at that time were operating only under the protocols. We thus concluded that the Legislature intended the phrase "following the instructions of a physician" to include both direct and indirect (i.e. protocols) instructions. We further noted that a contrary construction would mean that an EMT following a doctor's direct instruction in performing a medical procedure would be immune, whereas, an EMT performing the same procedure in the same manner pursuant to an established medical protocol would be liable. Ambrose v. New Orleans Police Dep't Ambulance Service, 627 So.2d 233, 242-43 (La.App. 4th Cir.1993), rev'd on other grounds, 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216.
[20] The parties have not disputed the first requirement.
[21] Giving a circumscribed construction to an EMT immunity statute and finding it did not encompass the negligent preparation of a run report, the court in DeTarquino reasoned, "[i]f the Legislature had intended to confer a more expansive form of immunity upon EMT[s] . . . it could have conferred general immunity upon such persons for any negligent conduct in the performance of their duties including negligent operation of a motor vehicle." DeTarquino v. City of Jersey City, 352 N.J.Super. 450, 456, 800 A.2d 255, 259 (App.Div.2002).
[22] That reference, we note, apparently was the result of Priority's argument in opposing the summary judgment that the violent and abusive patient rule was a protocol. We further note that although in Browning v. West Calcasieu Cameron Hosp., 2003-332 (La.App. 3 Cir. 11/12/03), 865 So.2d 795, writ denied, XXXX-XXXX (La.2/13/04), 867 So.2d 691, the Third Circuit labeled a hospital's rules regarding obtaining and documenting a patient's refusal of service as a "protocol," this court has consistently defined a protocol to mean an approved set of medical orders for life-threatening situations EMTs encounter on a routine basis; and as discussed above, this limited construction of the protocol exception is consistent with La. R.S. 40:1234 E.
[23] Priority's seizure protocol is in the form of a flowchart, which begins with the question "has patient experienced a seizure?" Mr. Samuel, the senior EMT, testified that he believed Mr. Rathey had experienced a seizure. The next question on the flowchart is whether the patient is actively seizing? If so, the flowchart instructed the EMTs to "protect airway with passive restraint." If not, the flowchart instructed the EMTs to "protect airway" and "protect for injury" and then asked if the patient was "postictal." If the patient was "postictal," the EMTs were instructed to start oxygen. At trial, it was established that passive restraint means soft restraint and that it does not mean hard restraints (i.e., handcuffs or shackles). It was also established, through the expert testimony of Dr. Domangue, discussed above, what the medical term "postictal" means.
[24] Once in the ambulance, the EMTs contacted CMC to advise that they were en route to the emergency room with a combative, seizure patient.
[25] Another distinction between the liability of Priority's EMTs and the Sheriff's Office's deputies is that they are governed by different qualified immunity statutes. These different statutes have different predicate requirements.
[26] The record reflects that it is questionable if Mr. Rathey was hog-tied when he was placed in the ambulance at McDonald's. Both Ms. Savoy and Deputy Acosta indicated it would not have been possible for him to be transported in that position on the gurney, and the CMC emergency room records do not indicate that he was tied when he arrived at the hospital.
[27] Dr. Olson rejected the suggestion that the aggravation of Mr. Rathey's prior neck injury was caused by his banging his head against the glass door at McDonald's before the EMTs arrived. Dr. Martin, however, disagreed with Dr. Olson on this point.
[28] Dr. Olson also noted that Mr. Rathey had a very limited educational background and significant responsibility in caring for his ailing wife.
[29] As noted, the jury allocated 30% of the fault to Mr. Rathey.
[30] The issue was whether the type (a) cases the jurisprudence had recognized were "humanitarian decisions designed to avoid the harsh bar of contributory negligence, or did they reflect other critical social policies?" Louisiana Tort Law, supra at § 9-5. The language of the 1980 version of La. C.C. art. 2323 "[w]hen contributory negligence is applicable ... the effect shall be ..." apparently granted courts discretion on this issue. Id. The 1996 tort legislation may have abolished the ability of a negligent plaintiff to recover one hundred percent of his or her damages from a non-intentional tortfeasor. Id. However, this case arises from a 1995 tort; hence, the 1980 version of Article 2323 applies.
[31] No evidence exists that Mr. Rathey was taking a generic medication.
[32] We note that the parties did not assign as error that the percentages of fault were erroneous. Rather, both sides simply argue that they should have been found entirely free from fault.
[33] The following hypothetical demonstrates this point. If the jury had apportioned percentages of fault at 10% to Mr. Rathey, 20% to Priority, and 70% to the Sheriff's Office, under the plaintiffs' rationale, the reallocation of the 70% assigned to the Sheriff's Office would result in an additional 46.67% fault being allocated to Priority, making Priority liable for 66.67% of the total damages. We find that the intent of the legislature, as interpreted by the Supreme Court and the courts of appeal, was in this hypothetical case to assure that the plaintiff collect only 50% of his damages from Priority although Priority was assigned but 20% of fault by the trier of fact. The legislature never intended for Priority to be liable for more than 50% of Mr. Rathey's damages in this hypothetical case. If this tort had occurred after the 1996 amendment to La. C.C. art. 2324(B), no question exists that the trial court could not reallocate the fault of the immune defendant. Although the trial court found the 1996 amendment inapplicable, it determined that because this case involves neither a statutorily immune employer nor an intentional tortfeasor the Gauthier approach does not apply.
[34] We note that the trial court found no inconsistency between the two separate judgments rendered in this bifurcated trial. Rather, the trial court found the judgments consistent in that both the trial court and the jury found the Sheriff's Office was not grossly negligent; thus no liability should be assigned to the Sheriff's Office.
[1] As the trial court noted, the Louisiana Supreme Court has held that the 1996 amendment to La. C.C. art. 2324(B) applies prospectively. Aucoin v. State, Dep't of Trans. and Dev., 97-1938, 97-1967, pp. 8-10 (La.4/24/98), 712 So.2d 62, 67-68.